691 A.2d 907

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Antuan BRONSHTEIN, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 1995.

Decided March 25, 1997.

464

466

John I. McMahon, Jr., Conshohockn, for A. Bronshtein.

Mary MacNeil Killinger, Robert A. Graci, Office of Attorney General, for Commonwealth.

Before NIX, C.J., and FLAHERTY, CAPPY and CASTILLE, JJ.

## *OPINION OF THE COURT*

CASTILLE, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of Montgomery County.[1] Following a jury trial, appellant was convicted of first degree murder,[2] robbery,[3] theft of movable property,[4] possession of an instrument of crime [5] and criminal conspiracy to commit murder.[6] The jury determined that the two aggravating circumstances it found outweighed the three mitigating circumstances established by the evidence and returned a sentence of

1. 42 Pa.C.S. § 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. § 3701.
4. 18 Pa.C.S. § 3921(a).
5. 18 Pa.C.S. § 907.
6. 18 Pa.C.S. § 903.

death.[7] In addition to the court's imposition of the jury's verdict of death for the murder conviction, the trial court sentenced appellant to a consecutive term of ten to twenty years imprisonment on the robbery conviction, a concurrent term of five to ten years imprisonment on the conviction for criminal conspiracy and a concurrent term of two-and-a-half to five years imprisonment on the conviction for possessing an instrument of crime. Post-sentence motions were denied.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant first contends in this appeal that the evidence was insufficient to support his conviction for first degree murder. The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to support all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Carpenter*, 511 Pa. 429, 435, 515 A.2d 531, 533–34 (1986).

The evidence at trial established that on January 11, 1991, at approximately 4:45 p.m., Montgomery County police were called to the King of Prussia Shopping Center to investigate suspicious circumstances at a store called Jewelry by Alex. The manager of the shopping center had become concerned because, while touring the mall during regular business hours, he noticed that one of the jewelry cases in the store which was visible from outside the store was broken and that no one appeared to be in the store even though the store was supposed to be open for business. The manager also noticed

7. The aggravating circumstances were that appellant committed the killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that appellant had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9). The mitigating circumstances were that appellant was suffering from an extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2); that the appellant had a poor childhood upbringing; 42 Pa.C.S. § 9711(e)(8); and that there was a possibility that the appellant did not actually pull the trigger, 42 Pa.C.S. § 9711(e)(8).

that the store's security door was locked.[8] Police disabled the security lock and entered the store, where they observed that one of the four glass jewelry cases was broken and empty of all jewelry. They also noticed that there were empty display boxes scattered on the floor in front of the broken case. Further investigation revealed three fingerprints and a palmprint on one of the intact display cases. These prints were later determined to be those of appellant.

Police also observed the safe in the office in the rear of the store open and empty, with empty jewelry boxes scattered in front of it as well. An inventory later determined that approximately $60,000 worth of bracelets, diamonds and loose gemstones, as well as all lay-a-way and repair items, were missing from the store.

Upon further investigation, the police discovered the body of Alexander Gutman, the owner of the store, in the bathroom with two gunshot wounds to his face. The coroner determined that the fatal shots were fired from approximately five to eighteen inches away from the decedent. Police also determined that the gun which the decedent kept in his desk drawer was missing and found the empty holster on the decedent's desk. A ballistics expert determined that the bullets which killed the decedent and were from the box of ammunition found in the decedent's desk were fired from the same type of gun as that owned by the decedent.[9]

On February 27, 1991, appellant of his own volition contacted Philadelphia police investigators and stated that he wished to discuss the murder of another jeweler, Jerome Slobotkin, which had occurred in Philadelphia on February 19, 1991. Appellant told the police investigators that he was on his way to Florida to flee the country, but that he had changed his mind and decided to confess to the Slobotkin murder. After

8. The security door locked automatically when closed, and could only be opened by someone inside the store pushing a button behind the counter.

9. A spring and part of a clip from a semi-automatic weapon were found on the floor by the body, but ballistics determined that the bullets which killed the victim could not have been fired from the type of gun from which the broken clip and spring came.

returning to Philadelphia from South Carolina, appellant waived his *Miranda* rights and gave a detailed written confession admitting to the Slobotkin murder.[10] Appellant was later convicted of the Slobotkin murder in February of 1992.

However, on May 21, 1991, at appellant's request, police from Montgomery County met with appellant to discuss his knowledge of the Gutman murder. After being advised of his *Miranda* rights, appellant recanted his confession to the Slobotkin murder and told police that both Slobotkin and Gutman had been killed by a high-level member of what appellant referred to as the "Russian mafia." Appellant would only identify that person as "Mr. X." [11] Appellant stated that he knew Gutman from when the decedent had been a dentist in the Russian–Jewish community and he also knew that the decedent now owned a jewelry store. However, he denied ever having been to the store and claimed that he did not know where either the store or the King of Prussia Shopping Center was located. He further claimed not to have seen the decedent in more than two years.

At trial, Laura Sechrist testified that she passed the Jewelry by Alex store at approximately noon and saw two men in the store talking to the decedent. Larry Bainbridge, the postal carrier whose route included the jewelry store, testified that he passed the store at 12:45 p.m. and that although he saw a man he did not recognize behind the counter, he did not see the decedent. Alexander Daniels testified that he passed the store at approximately 3:15 p.m. and saw a man standing outside the store. Notwithstanding appellant's denial of having been to the decedent's jewelry store, each of these witnesses later identified appellant from a photo array as having been at or in the decedent's store on the afternoon of the murder.

10. *See, Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

11. Appellant refused to provide further information unless the police would grant him complete immunity, place him in the Federal Witness Protection Program and pay him $50,000–100,000. "Mr. X" was later identified by appellant as Adik Karlitsky, a person who allegedly had staged a robbery of his own jewelry store.

Wilson Perez testified at trial that sometime during January of 1991, after the Gutman murder but before the Slobotkin murder, he was riding in appellant's car in Philadelphia when appellant told him he had killed a guy in a jewelry store "out past the boulevard" and had taken his jewelry.[12] Perez further testified that appellant had given unset gemstones, including diamonds, to Perez's brother.

Evidence is sufficient to sustain a conviction for first degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Butler*, 446 Pa. 374, 378, 288 A.2d 800, 802 (1972). Furthermore, all co-conspirators to a murder can be found guilty of first degree murder, regardless of who actually inflicted the wound which resulted in death. *Commonwealth v. Jones*, 542 Pa. 464, 482, 668 A.2d 491, 500 (1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996), *citing Commonwealth v. Joseph*, 451 Pa. 440, 449, 304 A.2d 163, 168 (1973).

Here, the evidence the Commonwealth presented sufficiently established that appellant and an unknown co-conspirator went to the decedent's store, shot him twice in the face at close range and stole from the store a substantial amount of jewelry.[13] Such evidence clearly demonstrated that the killing was committed with the malice aforethought sufficient to sustain appellant's conviction for first degree murder. Hence, no relief is warranted on this issue.

12. At the time appellant made this statement to Perez, they were driving on Roosevelt Boulevard, a street that runs in a northerly and southerly direction through Northeast Philadelphia. In order to travel to Montgomery County from a large section of Northeast Philadelphia, it is necessary to cross the Roosevelt Boulevard in a westerly or northerly direction.

13. The identity of the other man seen in the jewelry store with appellant was never determined.

## SUPPRESSION OF STATEMENTS

■ Next, appellant alleges that the trial court erroneously denied his motion to suppress two statements which appellant made to the police investigators. In reviewing a ruling on a suppression motion, the standard of review is whether the factual findings and legal conclusions drawn therefrom are supported by the evidence. *Commonwealth v. Bond,* 539 Pa. 299, 306, 652 A.2d 308, 311 (1995).

The first statement which appellant contends should have been suppressed was his February 27, 1991, confession given to Philadelphia detectives regarding the Slobotkin murder. Appellant alleges that the detectives induced him to waive his *Miranda* rights by stating that:

> We will do what we can for you ... [But] there is not much we can do for you when you are charged with murder."

■ The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* rights. *Commonwealth v. Hughes,* 521 Pa. 423, 443, 555 A.2d 1264, 1274 (1989). In order to do so, the Commonwealth must establish that the warnings were given, and that the accused manifested an understanding of the warnings. *Hughes,* 521 Pa. at 443, 555 A.2d at 1274. However, a defendant's waiver of his *Miranda* rights must be free of an impermissible inducement by the police that the defendant would receive special treatment or a deal if he made a confession on the spot rather than waiting for his attorney. *Commonwealth v. Gibbs,* 520 Pa. 151, 553 A.2d 409 (1989).

■ Here, the trial court made findings of fact in denying the suppression of appellant's February 27, 1991 statement concerning his involvement in the Slobotkin murder. Specifically, the trial court found that on February 26, 1991, appellant began making a series of phone calls to the Philadelphia police expressing his desire to speak with someone about the Slobotkin murder. On February 27, 1991, appellant met a Philadelphia detective outside of the Philadelphia Police Administration building. The Philadelphia detective then escorted appellant inside the building and into an interview room

where he read appellant his *Miranda* rights. Appellant then stated that he shot Slobotkin. The Philadelphia detective then promptly administered another set of *Miranda* warnings and appellant answered and initialed each question on the *Miranda* form utilized by the Philadelphia police. Appellant subsequently gave a detailed account of his involvement in the Slobotkin murder. The Philadelphia detective admitted making the statement which appellant now alleges induced him into waiving his *Miranda* rights. The trial court noted that there was no period of time during which appellant made the challenged statement concerning the Slobotkin murder that appellant was arrested, confined, placed in handcuffs or restrained in any way.

Based on these facts, we conclude that appellant was not improperly induced into waiving his *Miranda* rights. The Philadelphia detective's statement, when viewed in its entirety, could not have induced appellant to waive his *Miranda* rights because the statement accurately described that facts surrounding a murder prosecution and appellant was never placed under arrest or restrained while he made the statement. Hence, this claim must fail.

The second statement appellant contends should have been suppressed was a statement he made to Montgomery County detectives on May 21, 1991, regarding the Gutman murder. Appellant contends that the statement was inadmissible because police initiated contact with him after he had retained counsel. In Pennsylvania, the Sixth Amendment right to counsel is specific to the offense charged. *Commonwealth v. Santiago*, 528 Pa. 516, 521–22, 599 A.2d 200, 202 (1991), *citing McNeil v. Wisconsin*, 501 U.S. 171, 175–76, 111 S.Ct. 2204, 2207–08, 115 L.Ed.2d 158 (1991). The United States Supreme Court declined to extend that right to all future investigations in *McNeil* because:

The police have an interest ... in investigating new or additional crimes [after an individual is formally charged with one crime]. To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel has not attached at the time the evidence was obtained, simply

because other charges were pending at that time, would unnecessarily frustrate the public's interest in investigation of criminal activities.

*Id.* (ellipse and brackets in original; citations omitted). Here, the trial court found that appellant initiated the May 21, 1991 contact with Montgomery County detectives after he was arrested and charged with the Slobotkin murder. While appellant had retained counsel for the Slobotkin murder, he was not arrested or charged in connection with the Gutman murder nor had he retained counsel in his defense for the present charges. Therefore, the fact that appellant had invoked his Sixth Amendment right to counsel in the Slobotkin murder did not preclude police from questioning him in the present case, since he had not yet been charged with any offenses giving rise to these charges.[14]

## JURY SELECTION ERRORS

### 1. *Voir Dire Questions*

Appellant next argues that the trial court erred in precluding defense counsel from questioning prospective jurors as to whether they could follow a limiting instruction on evidence of other crimes. Specifically, defense counsel requested the following *voir dire* question:

14. Appellant's presentation of the facts surrounding this statement differ quite markedly from that found by the trial court. An example of this discrepancy is that appellant contends that the Montgomery County police initiated the contact that resulted in appellant making a statement regarding his involvement in this case. Obviously, the trial court made a credibility determination based upon the evidence and we will not disturb this determination. *Commonwealth v. McCracken,* 540 Pa. 541, 551, 659 A.2d 541, 546 (1995) (Supreme Court must defer to credibility determinations made by trial court which had the opportunity to observe demeanor and hear testimony of witnesses.) Thus, since appellant initiated the interview in which he gave statements concerning the Gutman murder, that he was advised of his *Miranda* warnings and that he waived his right to counsel on that date, we conclude that the statements were made after a voluntary waiver of appellant's rights. *Commonwealth v. Youngblood,* 453 Pa. 225, 234, 307 A.2d 922, 927 (1973) (willingness of defendant to speak to police, indicated by interview initiated by defendant, and *Miranda* warnings constitutes a voluntary waiver).

The prosecution may present testimony that Mr. Bronshtein told authorities in February, 1991, that he killed a man named Jerry Slobotkin, for the sole purpose of attempting to prove identity in this case. Judge Ott will instruct you that you may only consider such testimony for that limited purpose and no other. Would you be able to follow this instruction, or would you automatically become so biased against Mr. Bronshtein upon hearing such testimony that you could not follow this instruction?

N.T. 4/4/94 at 3. The trial court refused that particular question, but instead asked all prospective jurors whether they would be able to follow an instruction to consider certain evidence only for a specific purpose and no other. *Id.* at 13.

 The scope of *voir dire* is within the discretion of the trial judge, and is intended to provide guidance in selecting a fair and impartial jury. *Commonwealth v. Paolello,* 542 Pa. 47, 77, 665 A.2d 439, 455 (1995). In determining the ability of prospective jurors to be impartial, questions which make reference to specific facts of the case to be tried are improper. *Commonwealth v. Christian,* 480 Pa. 131, 138–39, 389 A.2d 545, 548–49 (1978) (*voir dire* question prefaced by specific facts from case is improper). *See also Paolello, supra* (upholding as proper the decision of a trial judge to exclude questions concerning prospective jurors' opinions regarding alcohol use); *Commonwealth v. Terry,* 513 Pa. 381, 406, 521 A.2d 398, 410, *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987) (no abuse of discretion for trial court to preclude specific questions regarding how venirepersons felt about prisoners).

 The question submitted by appellant improperly referred to specific facts of the case. The question actually posed by the trial court was designed to ensure the impartiality of the jury and to avoid prematurely prejudicing the jury with facts about another murder appellant committed. Therefore, the trial court did not abuse its discretion in precluding the requested *voir dire* question.

## 2. Batson Claim

■ Appellant's next allegation of error is that the Commonwealth violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using a peremptory challenge to exclude a prospective Russian–Jewish juror from the final jury panel. In order to establish a *prima facie* case on a *Batson* claim, defendant must make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *Commonwealth v. Simmons,* 541 Pa. 211, 231–32, 662 A.2d 621, 631 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996), *citing, Commonwealth v. Spence,* 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993).

■ In the present case, appellant relies solely on the fact that the prosecutor used a peremptory strike against "the only venire person of Russian–Jewish ethnicity." This Court has never held that "Russian–Jewish" is an ethnic classification for the purposes of a *Batson* claim, and we need not determine this issue at the present time for several reasons. First, appellant failed to develop a record setting forth the race or ethnicity of the rest of the venire or the jurors eventually empaneled as required by *Simmons, supra.*

Furthermore, after the appellant lodged his objection to the Commonwealth's peremptory challenge to the single potential juror at issue, the trial court found that appellant did not establish a *prima facie* case of discriminatory use of peremptories. Accordingly, the trial court did not ask the Commonwealth to explain why it used a peremptory strike against the juror in question. However, the record reveals that the prospective juror equivocated on the death penalty on moral, religious and philosophical grounds and expressed serious reservations about serving on the jury because it would entail being separated from her "support group" during the anticipated two weeks of sequestration. N.T. 4/5/94 at 158–75.[15]

15. The record does not provide details of the venireperson's "support group."

Reasons such as these have been found by this court to be a proper basis for exercising a peremptory challenge. *See, Bond, supra* at 309–11, 652 A.2d at 313 (upholding as racially neutral use of peremptory strikes against a juror who equivocated on the death penalty and a juror who expressed reluctance to serve on the jury).

## TRIAL ERRORS

### 1. *Admission of Evidence Regarding Other Crimes*

Appellant next alleges that the trial court erred by admitting appellant's statement in which he admitted that he murdered Jerome Slobotkin. Although evidence of other crimes committed by a defendant is generally not admissible at trial, such evidence is relevant and admissible for the purpose of establishing the identity of the perpetrator or the existence of a common scheme, plan or design embracing the commission of two crimes which are so related to each other that proof of one tends to prove the others. *Commonwealth v. Hughes,* 521 Pa. 423, 459, 555 A.2d 1264, 1283 (1989). The existence of a common scheme is relevant to establish any element of a crime (e.g. the identity or intent of the perpetrator) so long as it does not merely indicate the defendant's propensity to commit similar crimes. *Commonwealth v. Miller,* 541 Pa. 531, 548, 664 A.2d 1310, 1318 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). In order for other crimes evidence to be admissible under this exception, a comparison of the crimes must establish a logical connection between them. *Hughes, supra.*

Here, the trial court expressly allowed evidence regarding the Slobotkin murder for the limited purpose of establishing the identity of the murderer in the Gutman murder. Thus, the issue is whether there was a logical connection between the two crimes in question that would allow admission of this evidence to prove the identity of the perpetrator. *See, Miller, supra.* The probative value of the degree of similarity of the crimes is inversely proportional to the time period separating the crimes. *Id.* at 549, 664 A.2d at 1319 (citations omitted).

■ In the present case, Slobotkin and Gutman, both identified as Russian–Jews, were murdered with firearms in the course of robberies at their respective jewelry stores. Both victims were shot in the head at close range. Appellant initially denied his involvement in both crimes but told police that he knew who had committed the crimes. Although appellant initially confessed to the Slobotkin murder, he later recanted that confession and told police that the two murders had been committed by the same person, a mysterious "Mr. X." Finally, the Slobotkin murder was committed only five weeks after the Gutman murder. Given the similarities between these two crimes occurring only weeks apart, evidence indicating the identity of the perpetrator of the Slobotkin murder was admissible for the purpose of establishing the identity of the perpetrator of the Gutman murder through a common scheme, plan or design. *Id.* (rape and attempted murder admissible at trial for other murders where crimes occurring over a five-year period were similar in the manner in which victims were chosen, the geographic location of the murders and wounds inflicted on the victims); *Commonwealth v. Reid,* 533 Pa. 508, 513, 626 A.2d 118, 121 (1993) (subsequent murder properly admitted at trial for prior murder to establish identity where the same gun was used in both crimes); *Hughes, supra* (prior rape properly admitted at trial for subsequent rape and murder occurring ten months later where crimes were similar in geographic location, time and method of attack and characteristics of victims).

■ Furthermore, the trial court gave limiting instructions both at the time the evidence was presented to the jury and in the jury charge that the evidence of the Slobotkin murder was only to be considered by the jury for the limited purpose of establishing identity.[16] The prosecution properly restricted its references to the Slobotkin murder to the issue of identity and mentioned the Slobotkin murder only five times in a seventy-one page closing argument, again properly limiting those references to a comparison between appellant's behavior in

---

16. The jury is presumed to follow the court's instructions. *Commonwealth v. Tilley,* 528 Pa. 125, 142, 595 A.2d 575, 583 (1991).

regard to the two crimes to establish the identity of appellant as the perpetrator of the Gutman murder. Under these circumstances, this Court finds that the testimony was properly admitted to demonstrate a common scheme in order to establish the identity of the perpetrator.

### 2. *Statement of Wilson Perez*

Appellant next argues that the trial court erred in allowing Commonwealth witness Wilson Perez to testify that appellant had told Perez that he killed someone "out past the boulevard" and had been paid for it.[17] This statement was made to Perez in late January of 1991, several weeks after the Gutman murder but before the Slobotkin murder. Appellant contends that the statement was too vague to be admissible in relation to the Gutman murder and that, because it was too vague to be a clear reference to that murder, it improperly placed before the jury evidence of a prior bad act.

The admissibility of evidence is a matter addressed to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion. *Commonwealth v. LaCava,* 542 Pa. 160, 172, 666 A.2d 221, 227 (1995) (citation omitted). Extrajudicial statements, which differ from confessions in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for admission into evidence under the party admission exception to the hearsay rule. *Simmons, supra* at 238, 662 A.2d at 634 (citation omitted). Evidence is relevant and, therefore, admissible if it logically tends to establish a material fact in the case, if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact. *LaCava, supra* at 172–76, 666 A.2d at 227–28.

At the outset, appellant's statement to Perez was more detailed than that portion cited by appellant in his brief. Perez's testimony established not only that appellant stated to him that he had killed someone "out past the boulevard" and

17. N.T. 4/13/94 at 181–82.

that he had been paid for it, but also that he had killed the victim in a jewelry store and taken the victim's jewelry. N.T. 4/13/94 at 190. Perez also testified that appellant had given several unset gemstones, including diamonds, to Perez's brother. *Id.* at 190–91. Therefore, contrary to appellant's assertions, the testimony was not so vague as to make any connection to the crime charged purely speculative. Appellant's admission to Perez that he had committed a crime in the general geographic location of the Gutman murder in a jewelry store and had stolen jewelry from the store were facts corroborated by appellant's fingerprints found in the victim's jewelry store, by appellant's possession of unset gemstones and by appellant's own statements to police, clearly support the reasonable inference that it was appellant who murdered the decedent. Appellant's admission to Perez was therefore admissible.

### 3. *Karlitsky Evidence*

Next, appellant argues that the trial court erred in precluding the defense from offering the testimony of a private investigator that Adik Karlitsky, the alleged "Mr. X," had been involved in a staged robbery of his own jewelry store at the Leo Mall for the purpose of defrauding his insurance company. Karlitsky was never charged in that robbery, in which no one was injured.

As discussed above, a trial court's ruling on an evidentiary matter will only be reversed on a finding of an abuse of discretion. *LaCava, supra.* The trial court found that the proffered testimony was entirely collateral to the proceedings.[18] Given that appellant failed to offer any evidence that there was any logical connection between the Slobotkin and Gutman murders and this dissimilar case, we hold that the

18. The proffer in the record concerning the substance of the investigator's testimony is extremely vague. Although defense counsel agreed to limit the testimony to what the investigator did in order to avoid hearsay concerns, he acknowledged that excluding hearsay would likely limit the testimony to the fact that the investigator was working with Philadelphia Police on a investigation which focused on Karlitsky. N.T. 4/19/94 at 43.

trial court did not abuse its discretion in excluding testimony regarding the Leo Mall jewelry store robbery.

## 4. *Prosecutorial Misconduct*

■ Appellant next contends that the trial court erred in refusing his numerous motions for mistrial based upon alleged prosecutorial misconduct in opening and closing arguments. It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted. *Simmons, supra* at 246–47, 662 A.2d at 638. Comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Sam,* 535 Pa. 350, 362, 635 A.2d 603, 608 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994) (closing statements); *Commonwealth v. Jones,* 530 Pa. 591, 607, 610 A.2d 931, 938–39 (1992) (opening statements).

■ In considering appellant's claims of prosecutorial misconduct, we note that a prosecutor's comments are not evidence. *LaCava, supra* at 180, 666 A.2d at 231, *citing Commonwealth v. Green,* 525 Pa. 424, 461, 581 A.2d 544, 562 (1990). Indeed, the trial court clearly and repeatedly instructed the jury, which is presumed to follow the court's instructions, on this rule of law. N.T. 4/13/95 at 17–18, 23–24; N.T. 4/20/94 at 165; *Commonwealth v. Johnson,* 542 Pa. 384, 400, 668 A.2d 97, 105 (1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996), *citing, Commonwealth v. Steele,* 522 Pa. 61, 78, 559 A.2d 904, 913 (1989). With these standards and circumstances in mind, we find that the complained-of comments were not improper.

### (a) *Opening Statement*

Appellant contends in his brief that the prosecutor improperly stated to the jury during opening arguments, "don't be deceived by the appellant's Mr. Rogers appearance." Appel-

lant's Brief at 30. At the outset, this is a mischaracterization of the prosecutor's statement. The actual comment to which appellant refers, in context, reads as follows:

[Prosecutor]: ... I will prove to you during the case that you will hear over the next week and a half, that what you see over there in that Defendant, Mr. Bronshtein, dressed like a young Mr. Rogers in a sweater and tie and shirt—

[Defense Counsel]: I object.

[The Court]: Overruled. It's opening.

[Defense Counsel]: Mr. Rogers?

[The Court]: It's opening statement.

[Prosecutor]: —did acts which belie his appearance that he brings before you. I will prove this to you through the evidence that you will hear in this courtroom from the Commonwealth witnesses.

You will see that he didn't look that way on January 11, 1991. He didn't have nice glasses on, wasn't wearing a sweater. His hair wasn't quite as well-groomed and short, and he had a big mustache at the time. . . .

N.T. 4/12/94 at 26.

Opening statements must be fair deductions from the evidence which the prosecutor expects will be presented at trial. *Jones, supra* at 607, 610 A.2d at 938; *Commonwealth v. Fultz,* 478 Pa. 207, 214, 386 A.2d 513, 516 (1978). At trial, the Commonwealth presented evidence that appellant had drastically changed his appearance since the time when the murder was committed, including shaving his mustache and wearing glasses. Because the complained-of statement was a fair deduction from the evidence and was within the bounds of proper oratorical flair, it did not rise to the level of prosecutorial misconduct and a mistrial was not warranted.[19]

19. The reference to "Mr. Rogers" apparently alluded to the popular children's television program "Mr. Rogers' Neighborhood" where Mr. Rogers is a mild-mannered, avuncular adult figure who can in no way be portrayed as a violent criminal. The complaint that the prosecutor refers to appellant as a "Mr. Rogers" can hardly be viewed as a negative comparison.

### (b) *Closing Statement*

■ Appellant also alleges several instances of prosecutorial misconduct in the closing argument which he claims entitle him to a new trial. The complained-of comments must be considered in the context of the entire seventy-one page summation and allegations of prosecutorial misconduct will not warrant the grant of a new trial unless they are such as to arouse the jury's emotions to such an extent that it is impossible for the jury to reach a verdict based on relevant evidence. *Johnson, supra* at 404–08, 668 A.2d at 107–08.

■ Appellant first alleges in his brief that the prosecutor argued that appellant was a "liar." At the outset, nowhere in the entire summation did the prosecutor expressly characterize appellant as a "liar." Although appellant does not quote any specific language, which in and of itself violates the Rules of Appellate Procedure,[20] he refers this Court to the pages of the transcript at which the prosecutor discussed appellant's confession to the Slobotkin murder, appellant's subsequent recantation of that confession, and his statement that the same person committed both the Gutman and Slobotkin murders. N.T. 4/20/94 at 107–10. This allegation is meritless.

■ Appellant next alleges that the prosecutor's argument exceeded the scope of the trial court's ruling which appellant claims limited the evidence of the Slobotkin murder to appellant's single statement that he killed Slobotkin. The trial court's order dealing with the use of the Slobotkin evidence provided as follows:

> The Court determines that other crimes evidence germane to proving the identity of the murderer of Alexander Gutman, including pertinent portions of Defendant's alleged confession of February 27, 1991, wherein he said he killed Jerome Slobotkin, shall be admissible at the trial of the within case because that admission, coupled with other evidence establishes a logically connection between the

---

**20.** See Pa.R.A.P. 2119(c) ("the argument must set forth ... a reference to the place in the record where the matter referred to appears").

crimes whereby proof of one will tend to show the Defendant is the person who committed the other.

Tr.Ct. order dated March 29, 1994.

■■■ A fair reading of the trial court's order in its entirety shows that appellant is taking a single phrase out of context and is attempting to assert that the trial court limited the evidence only to appellant's statement. Such a strained reading is not only inaccurate, but it also borders on violating an attorney's ethical requirements of candor to the tribunal. Because appellant's entire voluntary confession to the Slobotkin murder and his subsequent recantation of that confession were admitted for the purpose of establishing the identity of the Gutman murderer, and were therefore properly before the jury, the prosecutor was permitted to argue that the facts in evidence supported such a connection. Where the prosecutor's arguments are supported by the evidence and contain inferences which are reaso⟨ ⟩y derived therefrom, no new trial is warranted. *LaCava, supra* at 172, 666 A.2d at 227; *Commonwealth v. Hardcastle,* 519 Pa. 236, 254, 546 A.2d 1101, 1109 (1988), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990).[21]

Next, appellant contends the prosecutor engaged in misconduct when he made the following statement:

... And I suggest to you they would search high and low, heaven and hell, to try and get somebody in this courtroom, expert or otherwise, that can put Karlitsky somehow related to some scam—

\* \* \*

They would be more than happy to find somebody that would come in here and link him to some scam, link him to some involvement in the mob.

---

**21.** Appellant also contends that appellant's initial statement denying killing Jerome Slobotkin was not in evidence. This is simply not true. Lt. Augustine of the Philadelphia Police Department testified at length regarding appellant's telephone call from South Carolina in which he denied committing that murder and his subsequent confession to the murder. N.T. 4/15/94 at 190–98.

Ask their own so-called expert, the man they're putting forth as the expert, "Have you ever heard of Karlitsky?"

* * *

Did you hear that question even posed to their expert? Did you hear he heard him involved in anything?

What is this, what he has labeled, Nicky Scarfo-like head? What's his criminal background? No robberies, like he said. No murders, like he said. Big Nicky Scarfo, Daddy Warbucks Scarfo, headed this Russian Mafia, Russian Mob, has a shoplifting arrest from 1990. That's where they got his fingerprints from, a shoplifting arrest. No other criminal history, nothing with robberies, nothing with murders, no murder in Philadelphia where he says somebody was shot, or New York, where he says he shot forty-seven times. There's a smoke screen, ladies and gentlemen, you can conclude based on the evidence that's been presented to you.

That's something where they're trying to take your focus off the ball, trying to get your attention deflected off of what you can conclude based on the law and the evidence is the real truth in this case.

They want you to believe a Karlitsky. They have to have you believe in a Karlitsky if their defense is going to apply, if their defense is going to work.

But nobody has heard of him. He's not linked to any scams, not linked to organized crime—

* * *

No links whatsoever that have been brought forward in this case no matter how many times he wants to object, but that's still the way it is. And that's still the facts in this case.

The only thing they even alluded to—and I suggest to you, they didn't even give you the whole picture—was they alluded to some Leo Mall store he had as a jeweler. He starts talking about this consignment stuff.

You haven't heard one word about any consignment from Leo Mall. You haven't heard one word about his involvement in any scam from Philadelphia Police involved in the Leo Mall, not one iota about that; but they bring it forth and they argue it to you when they come here in closing to try and say, "Well, we'll infer he was involved in a scam here; so we'll take that and infer through our expert that Russians Jews are involved in scams and a lot of organized crime. From that, they do scams, and so we'll link him from maybe being in a scam, from being a Russian Jew to maybe working in scams they do. Wah-la [sic]. He's organized crime."

Think of the steps that takes. Think of the leaps they take when they try and take that to you and whether it's founded in any of the evide꞉ꞋꞋ that has been presented to you. Think of that, because that's the linchpin of their defense; because if this fear is dispelled, if this Karlitsky does not exist in terms of doing anything in this case, then their defense goes down the tubes.

N.T. 4/20/94 at 96–99.

■ Appellant complains that this was improper comment on the failure of appellant to present evidence which had been specifically excluded by the trial court. However, a review of the transcript of an *in camera* discussion reveals that, although appellant's expert had personally investigated the possibility of Karlitsky's involvement in an alleged scam at the Leo Mall jewelry store, there had been no evidence to link Karlitsky to any such scam or to link any jewelry scam to the Gutman murder. N.T. 4/19/94 at 42.[22] Thus, the evidence

---

22. This proffer indicated that if the expert had been asked if he ever heard of Karlitsky, his answer would apparently have been yes. It was therefore improper for the prosecutor to infer that the expert had never heard of Karlitsky. However, Montgomery County Homicide Detective Rohner testified before the jury that he received information that Karlitsky was suspected of having hired a third party to rob his store at the Leo Mall and relocated the "stolen" jewelry to another store. N.T. 4/15/94 at 15. In light of the fact that the jury was therefore informed that Karlitsky was in fact investigated for, but never linked to, that robbery, the prosecutor's improper statement did not prejudice appel-

which was suppressed was the unsubstantiated speculation of the expert, not any factual information which linked Karlitsky either to a scam at the Leo Mall jewelry store or to the Russian "mafia."

Trial counsel dedicated more than half of his sixty page closing argument to the theory that Karlitsky had committed the murder as part of a jewelry store scam involving the Russian "mafia," and that appellant had confessed to the Slobotkin murder out of fear of Karlitsky. Given that there was no evidence, either at trial or in the defense proffer on the substance of the excluded testimony, of Karlitsky's involvement in an alleged scam at the store or his connection to the Russian "mafia," it was not improper for the prosecution to ask the jury to draw an inference that no such evidence existed. *See, Commonwealth v. Griffin,* 537 Pa. 447, 461, 644 A.2d 1167, 1174 (1994) (the prosecutor is permitted to respond to closing remarks of defense counsel). Therefore, no relief is warranted on this issue.

The next statement which appellant challenges is:

Ladies and gentlemen, Wilson Perez also testified in this case, and there's no getting round he's a character either. But again, like the timing with Bronshtein's statements, the timing of Wilson Perez is critical. And also some of the promises that the Defense made to you in their opening is important with Mr. Perez.

Mr. Perez isn't the Commonwealth's problem. Mr. Perez is Mr. Bronshtein's problem. It's not the Commonwealth people that were hanging around with Wilson Perez. He was. He was his running buddy. He was the guy that kept the same company as Wilson Perez. They travelled around together, been [sic] to each other's apartments.

So when you're assessing Wilson Perez, you can also think what kind of person is hanging around with Wilson Perez. What's he like? How did he get into that situation or with those type of people? How do you meet somebody

lant. Aside from this error, the challenged statement accurately reflects the evidence presented at trial.

when you're down in front of a stoop in the Badlands section of Philadelphia? How do you meet somebody?

Does he look like the kind of person you would meet down on a stoop right now in the Badlands of Philadelphia hanging around with Wilson Perez, or does that verify what Detective Augustine said about looking like a choir boy today and how he looks, and his appearance, and what it is he's trying to show you folks?

\* \* \*

Ask yourselves why this person who's hanging around with Wilson Perez in the Badlands of Philadelphia—what kind of person is he? What kind of person is he? What do I think of Wilson Perez? What do I think of him?

N.T. 4/20/94 at 120–21; 140. Appellant contends that this comment inferred appellant's guilt as a result of his association with Perez, in violation of *Commonwealth v. Johnson*, 516 Pa. 527, 533 A.2d 994 (1987).

In *Johnson*, this Court held that the following statement by the prosecutor constituted reversible error:

Sure, I'd like to have law-abiding citizens as witnesses. The problem is that crimes usually aren't committed in front of law-abiding citizens. It is other criminals who see crimes committed. They are the ones who see the crimes. Robert Ahlborn and Scott Dunn, they are the criminals. They have lied. The defendant, Michael Johnson, is their friend. What does that tell you about Michael Johnson? Ask yourselves that. Who do criminals associate with?

*Id.* at 529, 533 A.2d at 995. However, there are several significant distinctions between the statement in *Johnson* and the complained-of statement in the present case.

█ First, the statement in *Johnson* implied that the defendant was a liar and a criminal because his associates were liars and criminals. However, in the statement at issue in the present case, the prosecutor did not brand Perez as either a liar or a criminal, despite the fact that Perez had a criminal record. All that can be inferred logically by the

statement at issue was that appellant's acquaintance with Perez meant that he was a person of less than sterling character as opposed to a liar and a criminal.

Second, the Court held in *Johnson* that the comment constituted an inference of guilt by association requiring reversal *"in the absence of a proper foundation." Id.* at 533–34, 533 A.2d at 997 (emphasis added). In the present case, *defense counsel* laid a proper foundation in his closing argument. Several times during summation, defense counsel acknowledged that appellant was involved in fencing stolen jewelry at the time of the murders. N.T. 4/20/94 at 22–23; 37–38. Furthermore, defense counsel stated in his summation, "Mr. Bronshtein isn't around those type of people anymore. He's not around that type of activity anymore. He was a kid mixed up with the wrong people back at that time." N.T. 4/20/94 at 71. Accordingly, defense counsel's inference of appellant's new-found good character opened the door for the prosecutor to comment on the character of appellant as judged by his earlier acquaintances.

Even if such a statement were improper, appellant is still not entitled to relief. This court's consideration of claims of prosecutorial misconduct is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect trial. *LaCava, supra, citing Commonwealth v. Holloway,* 524 Pa. 342, 353, 572 A.2d 687, 693 (1990) (citation omitted). Given that appellant himself testified that he associated with people of questionable character at the time of the murder and was himself engaged in criminal activity, the prosecutor's statement was a fair comment on the evidence presented and did not rise to the level of prejudice which would deprive appellant of a fair trial. Therefore, this issue does not warrant the grant of relief.

Appellant's final allegation of prosecutorial misconduct is that the prosecutor improperly referred to a prior consistent statement made by Wilson Perez which was not in evidence. Contrary to appellant's assertions, however, the statement to which the prosecutor referred was in fact admitted into evi-

dence during Perez's testimony. N.T. 4/13/94 at 183–92. Because the prosecutor was referring to facts in evidence, the statement was not improper and no relief is warranted. *Johnson, supra,* 542 Pa. at 406, 668 A.2d at 108, *citing Commonwealth v. Lawson,* 519 Pa. 175, 190, 546 A.2d 589, 596 (1988).

## PENALTY PHASE—JURY INSTRUCTIONS

▮ Appellant argues that the trial court erred in denying his request that the jury be instructed that the death penalty could only be imposed if the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. However, the death penalty statute does not specify a fixed burden of proof for the weighing of aggravating and mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Murphy,* 540 Pa. 318, 335 n. 5, 657 A.2d 927, 935 n. 5 (1995); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 66–67, 454 A.2d 937, 963 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (lack of fixed burden of proof in penalty phase of capital case is not unconstitutional). Appellant was therefore not entitled to an instruction which is not an accurate reflection of the law.

▮ Appellant's final claim of error is that the trial court erred in stating to the jury that it "should have no difficulty writing in the aggravating circumstances in the space provided" on the verdict slip. Appellant contends that this statement implied to the jury that aggravating circumstances existed.[23] In reviewing the propriety of jury instructions, the jury charge must be considered as a whole. *Commonwealth v. Saunders,* 529 Pa. 140, 144, 602 A.2d 816, 818 (1992).

**23.** Appellant was also convicted of robbery in connection with this murder. As recounted in more detail above, the record demonstrates that three eyewitnesses placed appellant at the jewelry store where the murder occurred, that one of the four jewelry cases was broken into and approximately $60,000 worth of jewelry was missing, and that appellant's fingerprints and palmprint were found on the jewelry cases. Given this evidence, there was sufficient evidence to support a finding of at least one aggravating circumstance: that the killing was committed in the perpetration of a robbery. 42 Pa.C.S. § 9711(d)(6).

At the outset, appellant has once again misquoted the record. The actual statement was as follows:

So then you go to Section A. There you will check "death" or "life imprisonment."

You already know from the instructions, if it's death, you have to complete B. If it's life imprisonment, you go and complete C.

Let's assume for the sake of discussion—we'll do it both ways—if you choose death, one of the two circumstances that I've described is here or found.

"B. The findings on which the sentence of death are based are"—either—"1. At least one aggravating circumstance and no mitigating circumstance."

And then you have to say, "The aggravating circumstance unanimously found is or are"—and you'll write them in, [Jury Foreman], just like they were written under Roman Numeral I–B–1. I realize there's only three lines in there. You'll squeeze it in, and you can go above it and below it. That's not a big deal.

N.T. 4/22/94 at 182–83. This statement was made in the midst of six pages of jury instructions in which the trial court reviewed the entire verdict slip with the jury and explained how to fill it out properly. N.T. 4/22/94 at 179–84. The trial court then went on to instruct the jury on how to fill out the verdict slip if they determined that the appropriate sentence was life imprisonment. Given the context in which the statement was made and the thorough instructions on the proper method of recording either a death or life sentence, the statement by the trial court, taken completely out of context, was not improper.

### LEGALITY OF SENTENCE

 Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3). After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor, but rather was based upon the evidence that appellant killed the victim with premeditation and malice aforethought during the commission of a robbery.

In addition, the evidence supports the finding of at least one aggravating circumstance specified in 42 Pa.C.S. § 9711(d). Here, the two aggravating circumstances found by the jury were that appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6) (commission of a robbery), and that appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9). The Commonwealth presented evidence that appellant had been convicted of the February 19, 1991, first degree murder and robbery of Jerome Slobotkin and of a February 24, 1991, burglary. Thus, the evidence supported each of these aggravating circumstances.

Finally, in accordance with *Zettlemoyer, supra* at 63, 454 A.2d at 961, we are required to conduct a proportionality review of the sentence.

This Court does not take lightly its statutory and constitutional duties and will conduct an independent evaluation of all cases decided since the effective date of the sentencing procedures under consideration (September 13, 1978). This independent review mandated by 42 Pa.C.S.A § 9711(h)(3)(iii) will utilize all available judicial resources and will encompass all similar cases, taking into consideration both the circumstances of the crime and the character and record of the defendant in order to determine whether

the sentence of death is excessive or disproportionate to the circumstances.

*Id.* As this Court has mandated, we have conducted our own proportionality review by independently examining similar cases, by reviewing the facts underlying the first degree murder, and by considering the sentencing data compiled by the Administrative Office of the Pennsylvania Courts (AOPC) pertaining to similar cases and conclude that the sentence of death imposed upon appellant is not excessive or disproportionate to the sentences imposed in similar cases.[24] *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Montgomery County.[25]

ZAPPALA, J., concurs in the result.

Former Chief Justice NIX did not participate in the decision of this case.

**24.** *See, e.g., Commonwealth v. Hughes,* 536 Pa. 355, 639 A.2d 763 (1994) (judgment of sentence of death affirmed where jury found as aggravating circumstance that the defendant committed the killing while in the perpetration of a felony and that appellant had been convicted of another murder committed at the time of the offense at issue and as mitigating circumstances that the defendant had no significant history of prior criminal convictions, that the defendant was under extreme mental or emotional disturbance, the age of the defendant and an unspecified circumstance under the catchall provision); *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313 (1992) (judgment of sentence of death affirmed where jury found as aggravating circumstance that the defendant committed the killing while in the perpetration of a felony and that appellant had a significant history of felony convictions involving the use of threat of violence and as mitigating circumstances that the defendant was under extreme mental or emotional disturbance, that the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the law was impaired and an unspecified circumstance under the catchall provision).

**25.** Within ninety days of the date the sentence of death is upheld by this Court, the Prothonotary of this Court is directed to transmit to the Governor's office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).