J. S33008/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :     IN THE SUPERIOR COURT OF
                                       :           PENNSYLVANIA
                v.              :
                                         :
JOSE ANTONIO CRUZ,          :          No. 92 EDA 2013
                                       :
                  Appellant      :

Appeal from the Judgment of Sentence, August 29, 2012,
in the Court of Common Pleas of Lehigh County
Criminal Division at Nos. CP-39-CR-0003697-2011,
CP-39-CR-0003701-2011

BEFORE:  FORD ELLIOTT, P.J.E., OLSON AND STABILE, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:**FILED SEPTEMBER 22, 2014**

Jose Antonio Cruz appeals from the judgment of sentence of August 29, 2012, following his conviction of one count of murder in the first degree, two counts of firearms not to be carried without a license, one count of aggravated assault, and five counts of robbery.  After careful review, we affirm.

The facts of this case have been aptly summarized by the trial court as follows:

> In June of 2011, the Appellant and Elba Lopez, along with their minor children[Footnote 4] resided at 3 Maryland Circle, Apartment #3, Whitehall, Lehigh County, Pennsylvania.  The Appellant and Ms. Lopez had been in a relationship, off and on, since 2008.  Throughout their relationship, the Appellant had concerns that Ms. Lopez was unfaithful to him.  On the morning of June 5, 2011, the

Appellant learned that Ms. Lopez had had a past relationship with one of her coworkers. The Appellant became upset and meandered throughout Allentown during the day, visiting with family members and consuming alcohol. The Appellant returned to his home at approximately midnight, but did not see either Ms. Lopez or his minor children in the home.[Footnote 5]

[Footnote 4] The couple had two children at the time of the instant crimes; Ms. Lopez has since given birth to a third child.

[Footnote 5] The Appellant testified that he only noticed that his 12 year old son from a prior relationship was in the apartment, playing video games in the living room area.

In the late evening hours of June 5, 2011, Alexis Lopez was visiting his sister, Elba Lopez, at the apartment she shared with the Appellant. When Mr. Lopez arrived at the home, Elba and the children were in the apartment, but the Appellant was either not at the home yet or was unseen by Mr. Lopez. Mr. Lopez stayed for approximately 45 minutes. As he left the apartment, he kissed his sister goodbye and proceeded down the steps outside of the individual apartment.

At this point, the Appellant had exited the bathroom of the apartment, naked, when he believed that [he] heard Ms. Lopez speaking to and kissing an unknown male. The Appellant confronted Ms. Lopez and the Appellant began to physically assault Ms. Lopez.

At this moment, Mr. Lopez was walking down the stairs when he heard an argument and heard his sister scream. He proceeded back up the stairs and encountered his sister running down the steps, carrying the two small children. She told him to run, that the Appellant had a gun.

The Appellant emerged from the apartment and fired a gun into the air. He then returned to his apartment to put on clothes.

Meanwhile, Mr. Lopez had taken Ms. Lopez and her children to the Appellant's mother's house, about 10 minutes away. Mr. Lopez left his sister and the children at that location, while taking the Appellant's mother and brother back to the apartment at 3 Maryland Circle so that they could speak to the Appellant. When they arrived back at the apartment, the Appellant was not there.

On a mission to find Ms. Lopez and/or the unknown male, the Appellant took Ms. Lopez's silver car to 420 West Oak Street, Allentown, Lehigh County, Pennsylvania, the home of Ms. Lopez's mother, Maria Sepulveda, and her husband, Edwin Jimenez-Gonzalez.

In the early morning hours of June 6, 2011, A[dal]berto Lopez, another brother of Elba Lopez, was at 420 West Oak Street. Mr. Lopez was working in a first floor computer room of the home and Ms. Sepulveda and Mr. Jimenez-Gonzalez were asleep in their bedroom on the second floor. At approximately 1 a.m., the Appellant arrived at the back door/kitchen door to 420 West Oak Street. Mr. Lopez responded to the door and the Appellant began to tell Mr. Lopez to let him into the home and asked where Elba Lopez was. Mr. Lopez refused to open the door and told the Appellant to leave, that Elba Lopez was not there. The Appellant began to force his way into the home.

Hearing the commotion at the door, Mr. Jimenez-Gonzalez came downstairs, along with Ms. Sepulveda. Mr. Lopez told Mr. Jimenez-Gonzalez not to open the door. Mr. Jimenez-Gonzalez walked to the back door and told Mr. Lopez that he was just going to talk to the Appellant. The Appellant demanded to speak to Elba Lopez. Mr. Jimenez-Gonzalez and Mr. Lopez repeatedly told the Appellant

that Elba Lopez was not there and told him to go home. Again, the Appellant attempted to enter the residence, forcing his way into the home. At that point, Mr. Jimenez-Gonzalez grabbed the Appellant and was able to push him to the door.

The Appellant immediately pulled a silver Magnum handgun out of the pocket of the black hoodie he was wearing, and said, "What's your problem?" to Mr. Jimenez-Gonzalez. Mr. Lopez told the Appellant to put the gun down and to leave the home. The Appellant continued to point the gun at Mr. Jimenez-Gonzalez. While inside the home, Mr. Jimenez-Gonzalez tried to grab the gun from the Appellant. The two began to struggle and the tussle wound its way to the rear patio of the home. A shot rang out, there was a pause, and a second shot rang out. Mr. Jimenez-Gonzalez screamed for someone to call the police, fought to get back inside the house and collapsed on the kitchen floor by the steps leading to the second floor. Ms. Sepulveda went to her husband to comfort him. The Appellant fled the residence.

The [Appellant]'s version of the events, as he testified at trial, differs slightly. The Appellant asserts that after he asked Mr. Jimenez-Gonzalez if Elba Lopez was at the home, a struggle between them ensued. The Appellant asserts that Mr. Jimenez-Gonzalez struck him in the face and grabbed him by the neck. The Appellant testified that he told Mr. Jimenez-Gonzalez "to back off" but that he did not. He then testified that Mr. Jimenez-Gonzalez grabbed the gun and as they struggled, a shot went off. The Appellant was unsure who was hit (although he felt no pain) and a second shot was fired. He admitted that he was the one who pulled the trigger twice during the struggle. He recalled seeing Mr. Jimenez-Gonzalez fall to the kitchen floor and immediately fled the scene because he "just wanted to get away."

An ambulance arrived shortly thereafter and took Mr. Jimenez-Gonzalez to the hospital. The

shots Mr. Jimenez-Gonzalez received were fatal. An autopsy was performed and the cause of death was determined to be gunshot wounds of the torso with fractures and visceral injuries. The manner of death was ruled a homicide.

Two .45 caliber shell casings were recovered from 420 West Oak Street and sent for further ballistic testing.

A short time after the alleged shooting, at approximately 1 am on June 6, 2011, Oscar Hernandez was driving his Ford Mustang at the intersection of Union Boulevard and Airport Road, Allentown, Lehigh County, near the Wawa convenience store. As he approached the intersection travelling south on Airport Road, a car from his right side proceeded through a red light and the two vehicles crashed. A witness from a nearby home came to the intersection to make sure that Mr. Hernandez was alright. Mr. Hernandez's vehicle was incapacitated at the scene and the striking vehicle came to a stop in the Wawa parking lot. While on scene, Mr. Hernandez heard gunshots from the direction of the Wawa.

Leandro Perez was also at the Wawa that morning, driving a white Jeep. After pulling up to one of the gas pumps, Mr. Perez exited his vehicle and attempted to open the cap of his gas tank. Immediately, a male approached him with a pointed handgun, demanding the keys to the Jeep. The individual appeared to be in a hurry and Mr. Perez noticed that he was wearing dark clothing and had a stream of blood going down his face. Mr. Perez told the individual that he couldn't give him the keys. The individual repeatedly asked Mr. Perez for the keys, but Mr. Perez refused to give them to him. The individual eventually walked or ran away. This interaction was observed by Jeannie McFarland, manager at the Wawa on that evening.

Ms. McFarland observed the same individual proceed to another car positioned at a different gas

pump, where Elionel Diaz-Rivera and his friend, Pedro Leon, were. Mr. Leon was driving a black Cadillac. Mr. Diaz-Rivera and Mr. Leon went inside the Wawa to prepay for gasoline and to use the ATM. They then began to walk back towards the car. Mr. Diaz-Rivera observed an unknown man wearing dark clothing exiting the Cadillac's driver's side door. The man approached Mr. Diaz-Rivera and Mr. Leon and asked them for the car keys. Mr. Diaz Rivera observed a gun at the man's waist. The keys were not turned over to the individual and Mr. Diaz-Rivera and Mr. Leon went back [inside] the Wawa store. Mr. Leon proceeded to hide behind a refrigerator after he overheard another patron say someone had a gun.

Carla Arce and her husband, Samir, were also at the Wawa, attempting [to] get gas for their Honda Accord. Samir, who was driving the vehicle, pulled up to the pump, with his window down and the door slightly ajar. Immediately a man pointed a gun to his head and told him to give him the car keys. Samir told the man that he would give him anything he wanted, but not to hurt either of the Arces. Ms. Arce remained in the passenger seat. The individual with the gun got into the driver's seat and pointed the gun at Ms. Arce's head. He asked her, "Do you know how to drive this piece of shit?" Ms. Arce told him she did not, as the car has a standard transmission. The individual exited the car and Ms. Arce quickly got out of the car to look for help. Ms. Arce observed the individual go towards another vehicle in the Wawa parking lot and observed the individual leave the Wawa, heading westbound.

Natasha Henn was also at the Wawa. She had parked her purple Dodge Neon in front of the convenience store while the friend she was with went into the store. Ms. Henn noticed that people inside of the Wawa were looking out of the window in her direction. Ms. Henn glanced behind her but didn't see anything. As she started to get out of her car, someone stopped her by grabbing her door. The

individual held a gun to her head and told her to get out. She had her keys in her hand, got out of the car and the individual got into the car. She ran into the store, with her keys still in her hand. She was able to notice that the individual was wearing black and had a cut on his face.

Raymond Shook and George Fetter were also at the Wawa that morning. Mr. Fetter was driving his son's black Audi and parked the vehicle in front of the Wawa store. Mr. Fetter exited the vehicle and went inside the Wawa, leaving Mr. Shook in the passenger seat, with the car's engine still on. Mr. Fetter heard an argument outside of the convenience store and turned around to see what was happening. He observed an unknown man getting into his Audi. Mr. Fetter walked back to the car and ran around to the rear of the vehicle. The individual then turned around to face Mr. Fetter, pointed a gun at him, and Mr. Fetter became scared. Mr. Fetter hunched down behind the vehicle and observed the unknown individual struggling with Mr. Shook inside of the car. Mr. Fetter then heard gunshots and Mr. Fetter ran away from the vehicle.

Meanwhile inside of the Audi, Mr. Shook saw Mr. Fetter approach the door of the Wawa, only to find the doors locked. At that moment, an unknown individual entered the Audi, pointed a gun at Mr. Shook's side and said, "Get out." Mr. Shook attempted to exit, but the door would not open. Mr. Shook told the unknown individual to open the doors and pushed the gun away from him. At that point, Mr. Fetter was approaching the vehicle. The individual got out of the car and confronted Mr. Fetter. When the individual returned, Mr. Shook was attempting to place his feet out of the passenger side window to escape. The individual shot at Mr. Shook, hitting him once through the left side (ribcage), while Mr. Shook was half-way out of the vehicle. After getting shot, Mr. Shook went into the Wawa store and asked for help.[Footnote 6]

[Footnote 6] All of the robbery victims, except for Ms. Arce, were able to positively identify the Appellant as the individual wielding the weapon and wearing the black hoodie.

It was later determined that the bullet entered the left side of Mr. Shook's rib cage, went underneath his heart, through his liver, bladder, colon, and intestines and became lodged in his leg, where it remains. Mr. Shook spent approximately two and a half months in the hospital and underwent a 10 hour surgery. He had four feet of his large bowel and five feet of his small bowel removed. He still has pain under his rib cage, has difficulty with his stomach and bowels, and suffered a blood clot in his lung. He continues to receive medical care.

Immediately after Mr. Jimenez-Gonzalez was shot, A[dal]berto Lopez called 911. Officers arrived, along with EMS personnel to attend to Mr. Jimenez-Gonzalez. Information was related to the communications center indicating a description of the Appellant and the vehicle he was driving. Further, the communications center received information regarding the vehicle accident involving Mr. Hernandez's car and from other sources at the Wawa regarding the incidents that took place at the Wawa. Descriptions received and additional information was disseminated via police radio.

At approximately 7:46 a.m. on June 6, 2011, Sergeant Eric Heicklen of the Allentown Police Department observed a vehicle matching the description and license plate information of the Audi stolen from the Wawa at 510 East Moser Street, Allentown, Lehigh County (the Washington Crossing Apartment complex). The Emergency Response Team (ERT) of the Allentown Police Department responded to the location and recovered the vehicle. After the building had been evacuated, the Appellant was located in Apartment 17 and was taken into custody. At that time, the Appellant had an abrasion

and lumping on his head and he was complaining of back pain.

At approximately 8:30 a.m. on June 6, 2011, Detective Pedro Cruz of the Allentown Police Department went to the Appellant's home at 3 Maryland Circle, Apartment #3, Whitehall, and searched the apartment. As a result, Detective Cruz found a .45 caliber shell casing outside of the Appellant's apartment building, next to the main door.

Inside of the apartment, Detectives Daniel Gross and William Lake of the Allentown Police Department recovered a key fob with the Audi symbol on it, hidden in the back of a speaker in the apartment's living room. Inside of another speaker, a lanyard with what appeared to be house keys was located. The Audi key was later returned to Mr. Fetter and corresponded with his vehicle. The lanyard with house keys was identified by Mr. Fetter's son as belonging to him.

Detective Mark Boyer of the Allentown Police Department determined that the Appellant did not have a license to carry a firearm.

Sergeant Kurt Tempinski of the Pennsylvania State Police Forensic Services, and qualified as an expert in toolmark and firearm examination, examined and determined that the bullets recovered from the victim's body were discharged from the same firearm. Further, he determined that bullet casings found at 420 Oak Street and at 3 Maryland Circle were discharged from the same firearm. The firearm was never recovered.

Trial court opinion, 5/21/13 at 3-11.

Following a jury trial, appellant was found guilty of the above-listed offenses. On August 29, 2012, appellant was sentenced to life imprisonment without parole, and a consecutive sentence of 3 to 6 years' incarceration.

No post-sentence motions were filed; however, on December 11, 2012, appellant was granted leave to file a **nunc pro tunc** appeal. New counsel was appointed, and notice of appeal was filed on December 20, 2012. Appellant complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

Appellant has raised the following issues for this court's review:

> A. Whether the lower court acted properly in denying [appellant]'s request for severance of the two informations and allowed the Commonwealth to use one trial to convict [appellant] for the two separate cases which involved charges of homicide and robbery?
>
> B. Whether the court acted properly in denying [appellant]'s request for a jury charge as it relates to voluntary manslaughter?
>
> C. Whether the lower court was correct, in determining that the police had properly advised [appellant] of his Miranda rights, did properly question [appellant], and therefore any statements made by [appellant] were permitted to be entered as part of the Commonwealth's case in chief?
>
> D. Whether or not there was sufficient evidence to sustain the finding of guilty as it relates to the charges of robbery?
>
> E. Whether the trial court properly allowed various pictures including pictures of the decedent to be entered as evidence against [appellant] which were inflammatory and otherwise of no probative [value]?

Appellant's brief at 8-9.

In his first issue on appeal, appellant argues that the trial court erred in denying his motion to sever. Appellant argues that the murder case should have been severed from the other charges; specifically, the robberies at the Wawa convenience store.

> Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant. **_Commonwealth v. Newman_**, 528 Pa. 393, 598 A.2d 275, 277 (Pa.1991). The Rules of Criminal Procedure provide:
>
> Joinder-Trial of Separate Indictments of Informations
>
> (A)  Standards
>
> > (1)  Offenses charged in separate indictments or informations may be tried together if:
> >
> > > (a)  the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
> > >
> > > (b)  the offenses charged are based on the same act or transaction.
>
> Pa.R.Crim.P. 582(A)(1)(a)-(b).

**_Commonwealth v. Wholaver_**, 989 A.2d 883, 898 (Pa. 2010).

> Evidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies. Such evidence is admissible, however, to show a

> common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others. This will be true when there are shared similarities in the details of each crime.

*Commonwealth v. Andrulewicz*, 911 A.2d 162, 168 (Pa.Super. 2006), *appeal denied*, 926 A.2d 972 (Pa. 2007), quoting *Commonwealth v. Keaton*, 729 A.2d 529, 537 (Pa. 1999) (internal citations omitted). "The following factors should be considered in establishing similarity: the elapsed time between the crimes; the geographical proximity of the crime scenes; and the manner in which the crimes were committed." *Commonwealth v. Judd*, 897 A.2d 1224, 1232 (Pa.Super. 2006), *appeal denied*, 912 A.2d 1291 (Pa. 2006) (citations omitted) (bullets omitted).

All of these crimes were part of the same criminal episode. Appellant committed the robberies at the Wawa in an attempt to escape after killing Jimenez-Gonzalez. After the accident with Hernandez, appellant's car was disabled. Appellant walked around the Wawa parking lot, displaying a handgun and demanding that people turn over their car keys. *See Commonwealth v. DeHart*, 516 A.2d 656, 661 (Pa. 1986), *cert. denied*, 483 U.S. 1010 (1987) (trial court did not err in consolidating the charges, where the defendant's escape from prison and subsequent crimes were part of the same transaction and the homicide, robbery, and burglary were perpetrated in furtherance of the escape). *See also Wholaver*, 989 A.2d at 899 ("Furthermore, because the charges all flowed from the same events

and were part of the same story, joinder for trial was appropriate."), citing Pa.R.Crim.P. 582(A)(1)(b); **Commonwealth v. Paddy**, 800 A.2d 294, 308 (Pa. 2002) (evidence of other crime admissible where it is part of the chain or sequence of events which became part of the theory of the case and formed part of the natural development of the facts).

The homicide and subsequent robberies were inextricably intertwined and would all be admissible in separate trials for each other. Appellant's motive for the robberies was to flee after killing Jimenez-Gonzalez. **See** Pa.R.E. 404(b)(2) (evidence of other crimes, wrongs, or acts is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). The robberies and shooting of Raymond Shook were also admissible to establish consciousness of guilt. **See Commonwealth v. Hudson**, 955 A.2d 1031, 1036 (Pa.Super. 2008), **appeal denied**, 964 A.2d 1 (Pa. 2009) ("When a person knows that he is wanted in connection with a criminal investigation, and flees or conceals himself, such conduct is admissible as evidence of consciousness of guilt.") (citation omitted). Furthermore, these crimes occurred in a linear sequence and were easily capable of separation by the jury so as to avoid danger of confusion. The trial court did not abuse its discretion in denying appellant's motion to sever the charges.

Next, appellant claims the trial court erred in refusing to give a jury instruction on voluntary manslaughter. Appellant argues that the evidence justified an instruction on imperfect self-defense. We disagree.

> It is clear that jury instructions regarding particular crimes or defenses are not warranted where the facts of the case do not support those instructions. *See Commonwealth v. Browdie*, 543 Pa. 337, 347-50, 671 A.2d 668, 673-74 (1996); *see also Commonwealth v. Harris*, 542 Pa. 134, 139-40, 665 A.2d 1172, 1175 (1995) (no self-defense instruction required where the evidence did not support self-defense); *Commonwealth v. Carter*, 502 Pa. 433, 443-44, 466 A.2d 1328, 1332-33 (1983) (trial counsel not ineffective for failing to request instruction on voluntary manslaughter where no evidence existed to support a conviction for that offense).

*Commonwealth v. Washington*, 692 A.2d 1024, 1028 (Pa. 1997), *cert. denied*, 523 U.S. 1006 (1998).

Section 2503(b) of the Crimes Code, voluntary manslaughter, provides, in relevant part, as follows:

> **(b) Unreasonable belief killing justifiable.--**A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b).

> Moreover, "unreasonable belief voluntary manslaughter," sometimes loosely referred to as "imperfect self-defense," *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991) (citing

> 18 Pa.C.S. § 2503(b)), will only justify a voluntary manslaughter instruction in limited circumstances: where a defendant held "an unreasonable rather than a reasonable belief that deadly force was required to save [his or her] life," and "all other principles of justification under 18 Pa.C.S. § 505 [] have been met." *Id.* Generally, the use of deadly force is not justifiable "unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat[]" 18 Pa.C.S. § 505(b)(2). Although a defendant has no burden to prove a claim of self-defense before such a defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 n.13 (Pa. 2012). The evidentiary elements necessary to prevail on a justification defense are that the defendant (a) reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) was free from fault in provoking the difficulty which culminated in the slaying; and (c) did not violate any duty to retreat. *Id.* at 1124 (citing 18 Pa.C.S. § 505).

***Commonwealth v. Sanchez***, 82 A.3d 943, 981 (Pa. 2013).

Appellant testified that Jimenez-Gonzalez struck him in the face and grabbed his neck, pushing him into the porch area. (Trial court opinion, 5/21/13 at 18.) Appellant and Jimenez-Gonzalez engaged in a struggle. (*Id.*) Appellant testified that he told Jimenez-Gonzalez to "back off" but he did not do so, and appellant pulled out a gun he had concealed in his clothing. (*Id.*) According to appellant, Jimenez-Gonzalez tried to grab the gun, and there was a struggle, during which the gun discharged twice. (*Id.*

at 18-19.) Appellant acknowledged that he had pulled the trigger. (**Id.** at 19.) Appellant then fled the scene. (**Id.**)

As the trial court observes, even accepting appellant's testimony that Jimenez-Gonzalez struck and pushed him and they engaged in a struggle, appellant cannot meet the second and third requirements of the self-defense statute, **i.e.**, that he was free from fault in provoking or continuing the difficulty which culminated in the slaying, and that he did not violate any duty to retreat. Appellant was told repeatedly by both Jimenez-Gonzalez and Adalberto Lopez that Elba Lopez was not present and to leave the premises. Appellant demanded to be let inside anyway. At this point, the evidence conflicts; Adalberto Lopez testified that appellant barged into the house and began struggling with the victim. Appellant testified that the victim eventually opened the door. (**Id.** at 17-18.) Regardless, it is clear that appellant entered the home without being invited to do so and after some degree of resistance. (**Id.** at 20.) Jimenez-Gonzalez had the right to defend himself inside his own home. Furthermore, even if Jimenez-Gonzalez struck appellant, it was appellant who drew the firearm and had his finger on

the trigger. Jimenez-Gonzalez was unarmed. We determine the trial court did not err in refusing to instruct the jury on voluntary manslaughter.[1]

Next, appellant argues that his statements to Detective Cruz, taken while he was in the hospital receiving medical treatment, were obtained in violation of **Miranda**.[2] (Appellant's brief at 22.) Appellant complains that while he was initially read his rights by Sergeant Birosik, Detective Cruz resumed questioning four hours later without re-reading appellant his rights. (**Id.**) Appellant also claims that he was suffering from head and back injuries and was not fully aware of his rights. (**Id.**)

> The role of this Court in reviewing the denial of a suppression motion is well-established:
>
> > An appellate court's standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression

---

[1] In the court below, appellant also argued that he was entitled to a voluntary manslaughter--heat of passion instruction. Appellant claimed that he was so enraged by Elba Lopez's perceived infidelity that he was in a "state of frenzy" when he encountered the victim, Jimenez-Gonzalez. (**Id.** at 14.) On appeal, appellant concedes that heat of passion would not apply where it was not the victim, Jimenez-Gonzalez, who caused appellant's anger. (Appellant's brief at 19.) Under Section 2503(a)(1), a person is guilty of heat of passion voluntary manslaughter if at the time of the killing he reacted under a sudden and intense passion resulting from serious provocation <u>by the victim</u>. Here, appellant's rage was not directed at the victim but, rather, Elba Lopez. In fact, appellant testified that, "I didn't go there to fight [the victim]." (Trial court opinion, 5/21/13 at 20.)

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Stevenson*, 894 A.2d 759, 769 (Pa.Super.2006) (citation omitted). Although we are bound by the factual and the credibility determinations of the trial court which have support in the record, we review any legal conclusions *de novo*. *Commonwealth v. George*, 878 A.2d 881, 883 (Pa.Super.2005), *appeal denied*, 586 Pa. 735, 891 A.2d 730 (2005).

*Commonwealth v. Wells*, 916 A.2d 1192, 1194-1195 (Pa.Super. 2007).

A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.

*Commonwealth v. Jones*, 546 Pa. 161, 170, 683 A.2d 1181, 1189 (1996) (citations omitted). "The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* rights." *Commonwealth v. Bronshtein*, 547 Pa. 460, 464, 691 A.2d 907, 913 (1997) (citation omitted).

*Commonwealth v. Parker*, 847 A.2d 745, 748 (Pa.Super. 2004).

We agree with the Commonwealth that while appellant did litigate a pre-trial motion to suppress his statements to Detective Cruz, the matter is waived for appellate review because at trial, it was appellant, not the Commonwealth, that introduced these statements into evidence. (Commonwealth's brief at 28.) The Commonwealth declined to call Detective Cruz and introduce appellant's statements into evidence because "the statement doesn't really advance the cause of my case." (Notes of testimony, 7/20/12 at 53.) Appellant told Detective Cruz that he was sorry and asked about his family. (Trial court opinion, 1/20/12 at 8.) Appellant asked about Elba Lopez's condition. (*Id.*) Appellant also stated that he loved Jimenez-Gonzalez like a father, and stated that he did not remember being at his house. (*Id.*) According to appellant, he had been drinking and using cocaine and "blacked out." (*Id.*)

At trial, appellant took the stand in his own defense and testified regarding these statements. (Notes of testimony, 7/20/12 at 133-134.) Therefore, we find that appellant has waived the issue. Furthermore, the statements were clearly made knowingly and voluntarily for the reasons discussed in the trial court's January 20, 2012 opinion denying appellant's pre-trial motion. Appellant was read his *Miranda* rights by Sergeant Birosik. (Trial court opinion, 1/20/12 at 10.) When Detective Cruz interviewed him four hours later, he again reminded appellant that his rights still applied. (*Id.* at 11.) Appellant appeared to understand his rights,

answered appropriately, and did not request an attorney. (*Id.*) Appellant did not appear to be medicated, and no member of the medical staff instructed the detective that appellant was unable to be interviewed. (*Id.*) When appellant said he wanted to stop answering questions, Detective Cruz ended the interview. (*Id.*) There is no merit to this claim.

In his fourth issue on appeal, appellant challenges the sufficiency of the evidence to sustain his conviction for robbery; specifically, the robbery of Pedro Leon ("Leon"). According to appellant, while he had the firearm tucked into his waistband, there was never any testimony that he brandished the firearm or directly threatened Leon. (Appellant's brief at 23.) Leon never testified that he felt threatened or in danger. (*Id.*)

> "A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Weston***, 561 Pa. 199, 749 A.2d 458 (2000). "For questions of law, our scope of review is plenary." ***Commonwealth v. Jackson***, 592 Pa. 232, 924 A.2d 618 (2007). "In reviewing a sufficiency challenge, a court determines whether the evidence, viewed in the light most favorable to the verdict winner, is sufficient to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Id.***

***Commonwealth v. Robinson***, 936 A.2d 107, 108 (Pa.Super. 2007), ***appeal denied***, 948 A.2d 804 (Pa. 2008).

Robbery is defined in 18 Pa.C.S.A. § 3701:

**(a) Offense defined.--**

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(ii)  threatens another with or intentionally puts him in fear of immediate serious bodily injury;

18 Pa.C.S.A. § 3701(a)(1)(ii).

[T]he Commonwealth need not prove a verbal utterance or threat to sustain a conviction under subsection 3701(a)(1)(ii).  It is sufficient if the evidence demonstrates aggressive actions that threatened the victim's safety.  For the purposes of subsection 3701(a)(1)(ii), the proper focus is on the nature of the threat posed by an assailant and whether he reasonably placed a victim in fear of "immediate serious bodily injury."  The threat posed by the appearance of a firearm is calculated to inflict fear of deadly injury, not merely fear of "serious bodily injury."  A factfinder is entitled to infer that a victim was in mortal fear when a defendant visibly brandished a firearm.

*Commonwealth v. Alford*, 880 A.2d 666, 676 (Pa.Super. 2005), *appeal denied*, 890 A.2d 1055 (Pa. 2005), quoting *Commonwealth v. Hopkins*, 747 A.2d 910, 914-915 (Pa.Super. 2000) (citations omitted).  "The fact that the threat may not have produced the intended fear is irrelevant." *Commonwealth v. Nelson*, 582 A.2d 1115, 1118 (Pa.Super. 1990), *appeal denied*, 593 A.2d 840 (Pa. 1991) (citation omitted).

Instantly, Leon and his friend, Elionel Diaz-Rivera, went inside the Wawa to pay for gas and use the ATM.  (Trial court opinion, 5/21/13 at 23.) As they walked back to Leon's Cadillac, appellant emerged from the driver's side door.  (*Id.*)  Appellant had a gun in his waistband.  (*Id.*)  Appellant asked for the car keys.  (*Id.*)  Leon and Diaz-Rivera fled inside the Wawa,

where Leon hid behind some refrigerators. (*Id.*; notes of testimony, 7/18/12 at 61-62.)

The fact that appellant did not actually draw his weapon or point it at Leon is irrelevant. Diaz-Rivera testified that appellant had the gun tucked into his waistband. Appellant's actions were threatening. Appellant did not have permission to be inside Leon's car. (*Id.* at 59.) Appellant demanded the car keys at which point the victims fled. Clearly, appellant intended to place the victims in fear of immediately serious bodily injury in an attempt to get them to turn over the car keys. In addition, although Leon did not testify that he was in actual fear of immediate serious bodily injury, the jury could fairly make such an inference. The fact that Leon was hiding behind refrigerators in the Wawa indicates that he was in fear of immediate serious bodily injury. The evidence was sufficient to convict appellant of robbery of Leon.

Finally, appellant argues that the trial court erred in allowing certain photographs to be entered into evidence, including one of the victim on the autopsy table. (Appellant's brief at 24-25.) Appellant argues that these photographs were inflammatory in nature and irrelevant since there was never a question that the victim was deceased and his cause of death. (*Id.* at 25.)

"The admission of photographs depicting a homicide victim or other aspects of the crime scene fall within the trial court's sound discretion and

- 22 -

only an abuse of that discretion will constitute reversible error." ***Commonwealth v. Mitchell***, 902 A.2d 430, 466 (Pa. 2006), citing ***Commonwealth v. Baez***, 720 A.2d 711, 726 (Pa. 1998), ***cert. denied***, 528 U.S. 827 (1999); ***Commonwealth v. Saranchak***, 675 A.2d 268, 275 (Pa. 1996), ***cert. denied***, 519 U.S. 1061 (1997).

It is well established that pictures of the victim are not ***per se*** inadmissible. ***Commonwealth v. Robinson***, 864 A.2d 460, 501 (Pa. 2004). However, admissibility of the photograph turns heavily upon the question of whether or not the photograph is inflammatory. Thus, the court must first determine whether the photograph is inflammatory. ***Commonwealth v. Chester***, 587 A.2d 1367, 1373-1374 (Pa. 1991). If the photo is not inflammatory, it may be admitted where "it has relevance and can assist the jury's understanding of the facts." ***Id.*** However, to admit a photograph that is inflammatory:

> the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

***Id.*** (citations omitted).

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would

> defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Commonwealth v. McCutchen*, 454 A.2d 547, 549 (Pa. 1982), quoting

*Commonwealth v. Petrakovich*, 329 A.2d 844, 849 (Pa. 1974).

Instantly, the trial court only admitted one photograph of the victim. The remaining photographs are of the crime scene, appellant's vehicle, the victim's home, Mr. Fetter's vehicle, bullet fragments, *etc.* Commonwealth's Exhibit 20 depicts the victim lying on the autopsy table, from the waist up. While a large sutured wound with a surgical tube sticking out of it is visible, the picture is not particularly gory or bloody. There are no visible signs of blood or internal organs. We agree with the trial court that this photograph was not inflammatory and was relevant to show intent. (Trial court opinion, 5/21/13 at 26.) The trial court did not abuse its discretion in admitting this photograph.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2014