**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Ryan FREE, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 31, 2006.
Filed June 23, 2006.

Hugh J. Burns, Jr. and Molly Selzer, Asst. Dist. Atty's, Philadelphia, for Com., appellant.

Daniel P. Alva, Philadelphia, for appellee.

BEFORE: McCAFFERY, PANELLA, and JOHNSON, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, the Commonwealth of Pennsylvania, appeals from the trial court's order granting, in part, Appellee Ryan Free's motion to dismiss the criminal charges filed against him.[1] Specifically, the Commonwealth seeks a determination of whether the trial court abused its discretion in finding that Appellee's due process rights would be violated if he were required to go to trial in the absence of evidence that had been destroyed. After careful consideration of the applicable law and a thorough review of the certified record, we reverse and remand for further proceedings.

¶ 2 The relevant facts, gleaned from the trial court opinion, the parties' briefs, and the certified record, are as follows. In September 2002, Appellee was arrested and charged in Philadelphia with Possession of a Controlled Substance and Possession with Intent to Deliver ("PWID").[2] Police executed a search warrant at the property where Appellee was arrested, seizing approximately 174 marijuana plants[3] from various rooms in the house, as well as fluorescent lights, fertilizer, and other materials commonly used for growing marijuana. (Notes of Testimony ("N.T."), 2/26/04, at 7–8).

¶ 3 The confiscated plant material was taken to the Philadelphia Police Department's Chemistry Laboratory, where chemist Ninan Varughese received it in seven large plastic bags that had been sealed with evidence tape. (Id. at 19). Varughese inspected, weighed and counted the plants and accompanying matter in each bag, determining that it was, indeed, marijuana. He also photographed the contents of each bag and retained a sample from each bag. (Id. at 19–30). Varughese then calculated the number of live plants, i.e., those that were "fresh" and contained roots. (Id. at 21). In addition, Varughese noted where bags contained dried plants, loose marijuana leaf, and spongy material, known as rock wool, used for "cloning" plants. (Id. at 30). Finally, Varughese determined the approximate height of the plants with the use of a meter stick, which stick was visible in the photographs. (Id. at 25).

¶ 4 Pursuant to police department policy, the marijuana plants were to be destroyed promptly after Varughese's analysis. Philadelphia Police Corporal Patricia Donahue of the department's forensic sci-

---

1. This order is appealable by the Commonwealth pursuant to Pa.R.A.P. 311(d). See Commonwealth v. Karetny, 583 Pa. 514, 527, 880 A.2d 505, 513 (2005) (holding that the Commonwealth is entitled to appeal from an order quashing some, but not all, of the charges filed against a criminal defendant).

2. 35 P.S. § 780–113(16) and 35 P.S. § 780–113(30), respectively.

3. As discussed infra, the precise amount of marijuana recovered is the primary issue in this case.

ence division, testified to the following department protocol regarding the maintenance and destruction of evidence:

[S]eizures of fresh marijuana and live marijuana plants have caused grave storage problems and health infestation hazards, therefore[,] live marijuana plants will be counted, weighed, photographed[,] and analyzed so that the exact number and weight of live plants necessary for mandatory minimum purposes is preserved as evidence. Material from plants will be preserved for re[-]analysis and presentation in court; the remaining material will be destroyed after analysis.

(N.T., 9/16/03, at 19–20).

¶ 5 Despite the existence of the policy, the plants in this case were not destroyed immediately after Varughese completed his analysis. Instead, the plants remained in the custody of police for an additional six months, until March 19, 2003. On that date, police destroyed the plants pursuant to a court order dated February 12, 2003, which was based on the Commonwealth's assertion that the matter had been "finally and fully disposed." [4] (N.T., 9/16/03, at 15). However, on March 18, 2003, the day before the destruction, the trial court signed an order granting Appellee's expert, John Gettman, an opportunity to examine the evidence which had been seized. When Gettman arrived at the lab to inspect the evidence, the only evidence available for examination was that which had been retained in sample form by chemist Varughese. All of the remaining evidence had been destroyed.

¶ 6 Appellee moved to dismiss the charges against him based on the destruction of evidence and his consequent claim

that he would be denied due process if he were forced to defend against the charges without having had the opportunity to examine *all* of the evidence. A series of hearings on the motion took place in Philadelphia Municipal Court in late 2003 and early 2004, and the court initially held the matter under advisement. On October 5, 2004, the Municipal Court judge granted the motion in part, dismissing the PWID charge, but permitting the Commonwealth to proceed on the simple possession charge. The Commonwealth filed an appeal with the Philadelphia Court of Common Pleas, which affirmed the ruling of the Municipal Court. The Commonwealth thereafter filed the instant appeal, in which it raises the following single issue for our review:

Did the lower court err in affirming the dismissal of the charge of [PWID] on the ground that [Appellee's] marijuana plants were destroyed by the police, where [Appellee] failed to prove: that the plants possessed exculpatory value that was apparent before the evidence was destroyed; that he was unable to obtain comparable evidence by other reasonably available means; or that the police acted in bad faith?

(Commonwealth's Brief at 4).

■ ¶ 7 "The decision to grant a pretrial motion to dismiss a criminal [charge] is vested in the sound discretion of the trial court and may be overturned only upon a showing of abuse of discretion or error of law." *Commonwealth v. Moore,* 756 A.2d 64, 65 (Pa.Super.2000). We begin our analysis, as did the trial court, with a review of well-established United States Supreme Court jurisprudence governing

---

**4.** Apparently, Appellee's open case had been erroneously included in a list of cases the District Attorney certified as being closed, thereby allowing for the "narcotics and nar-

cotics paraphernalia designated in the accompanying list [to] be destroyed." (N.T., 9/16/03, at 15).

due process claims based on the government's destruction of evidence.

¶ 8 In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the appellants claimed a violation of due process when the state of California failed to preserve breath samples it had taken in connection with a drunk driving offense. A state appellate court ruled in favor of the appellants and held that due process required that arresting officers preserve the breath samples. The matter then came before the United States Supreme Court. The Court noted that the fundamental fairness afforded under the Due Process Clause of the Fourteenth Amendment includes "a meaningful opportunity to present a complete defense," which, in turn, provides criminal defendants with "a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment imposed." *Id.* at 485, 104 S.Ct. 2528. In considering the breadth of this protection under the Fourteenth Amendment, the *Trombetta* Court recognized the well-established duties of the government to (1) turn over exculpatory evidence, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) reveal the existence of plea agreements with key government witnesses, *Giglio v. U.S.,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and (3) in some instances, disclose the identity of undercover informants. *Roviaro v. U.S.,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

¶ 9 Noting that the issue before it was different from the issues in *Brady, Giglio,* and *Roviaro,* the *Trombetta* Court then squarely addressed "the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants."

*Trombetta,* 467 U.S. at 486, 104 S.Ct. 2528. With regard to specific evidence that had been destroyed by the government, the Court held that two distinct inquires must be made, to wit: the court must consider whether the evidence had "exculpatory value that was apparent before the evidence was destroyed," and whether the evidence was of such a nature that the defendant would be unable to "obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. 2528.

¶ 10 Applying this test, the *Trombetta* court held that the exculpatory value of the breath samples was not at all apparent, as they had indicated that the appellants were intoxicated. Noting the accuracy of the testing device, the Court reasoned that "[i]n all but a tiny fraction of cases, preserved breath samples would simply confirm the Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration at the time of the test." *Id.* Further, any challenge to the validity of the test results naturally would focus on a possible defect or malfunction of the testing device. Thus, the destruction of the breath samples did not preclude the appellants from asserting the variety of arguments they proffered as the bases for finding the test results unreliable, including "faulty calibration, extraneous interference with machine measurements, and operator error." *Id.* at 490, 104 S.Ct. 2528. Rather, the Court concluded, the appellants were "perfectly capable of raising these [and other] issues without resort to [the] preserved breath samples." *Id.*

¶ 11 In addition to concluding that the appellants had failed to establish that the destroyed evidence was "apparently exculpatory," and likewise had failed to show that its destruction left them no other means of mounting a defense to the

charges, the *Trombetta* Court placed great weight on the fact that the officers who destroyed the breath samples did so in the absence of bad faith:

California authorities in this case did not destroy [Appellants'] breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for [Appellants], the officers here were acting in good faith and in accord with their normal practice. The record contains no allegation of official animus towards [Appellants] or of a conscious effort to suppress exculpatory evidence.

*Id.* at 488, 104 S.Ct. 2528 (citation and quotation omitted).

¶ 12 The *Trombetta* Court ultimately concluded that the Due Process Clause of the Fourteenth Amendment did not require the preservation of breath samples. *Id.* at 491, 104 S.Ct. 2528. Two years after the *Trombetta* decision, a panel of this Court addressed an identical issue and, relying on *Trombetta,* held that "the Pennsylvania Constitution commands no more due process protection than afforded under the Federal Constitution." *Commonwealth v. Gamber,* 352 Pa.Super. 36, 506 A.2d 1324, 1327, 1328–29 (1986) (holding that a "defendant's [state constitutional] rights are not abridged by the Commonwealth's failure to preserve a breath sample.").

¶ 13 In later years, the United States Supreme Court clarified the rule of *Trombetta* by reiterating the requirement that bad faith be averred and established. *See Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process."). More recently, the Court held that the existence of a pending discovery request does not negate the necessity of showing bad faith. *Illinois v. Fisher,* 540 U.S. 544, 547–48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (holding that where police destroyed cocaine 11 years after the defendant was charged, fugitive/defendant's open discovery request for examination of drugs did not eliminate the need to establish bad faith in destruction of evidence).

■ ¶ 14 In the case *sub judice,* Appellee insists that the Commonwealth's destruction of the marijuana plants violated his due process rights. He has challenged the accuracy of the Commonwealth's evidence as to the number of plants and the weight of the marijuana. Essentially, Appellee has argued that because his expert was not able to examine *all* of the evidence seized in this case, Appellee was unable to mount a defense on the issue of mandatory sentencing, which, in the context of marijuana possession, is based on the number of live marijuana plants or the aggregate weight of the marijuana.

¶ 15 The relevant statute provides:

a) **General rule.**—Notwithstanding any other provisions of this or any other act to the contrary, the following provisions shall apply:

(1) A person who is convicted of violating section 13(a)(14), (30) or (37) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, where the controlled substance is marijuana shall, upon conviction, be sentenced to a mandatory minimum term of imprisonment and a fine as set forth in this subsection:

(i) when the amount of marijuana involved is at least two pounds, but less than ten pounds, or at least ten live plants but less than 21 live

plants; one year in prison and a fine of $5,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: two years in prison and a fine of $10,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity;

(ii) when the amount of marijuana involved is at least ten pounds, but less than 50 pounds, or at least 21 live plants but less than 51 live plants; three years in prison and a fine of $15,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; however, if at the time of sentencing the defendant has been convicted of another drug trafficking offense: four years in prison and a fine of $30,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity; and

**(iii) when the amount of marijuana involved is at least 50 pounds, or at least 51 live plants; five years in prison and a fine of $50,000 or such larger amount as is sufficient to exhaust the assets utilized in and the proceeds from the illegal activity.**

18 Pa.C.S.A. § 7508(a)(1) (emphasis added).

¶ 16 In this case, the evidence proffered by the Commonwealth's chemist was that Appellee possessed 174 to 221 live plants, rendering him subject to the greatest mandatory minimum sentence: five years in prison and at least $50,000 in fines. 18 Pa.C.S.A. § 7508(a)(1)(iii). The trial court recognized the significance of being able to determine the nature of each "plant" seized by police. (Trial Court Opinion at 4). As explained by Gettman, Appellee's expert, live plants have "lots of vegetative growth on them, [and] have a root system." (N.T., 11/13/03, at 33). Cuttings from live plants that do not have established root systems are not live plants. (*Id.* at 25).

¶ 17 The trial court set forth a number of reasons for its finding that the chemist's report and accompanying photographs were insufficient to allow Appellee to challenge the sentence the Commonwealth sought to have imposed. Specifically, the court noted that Gettman could not tell from the photographs whether some of the plants had roots, which would indicate that they were "live." Further, Gettman noted the presence of stalks and dried plants, which he explained are excluded from the statutory definition of marijuana. Gettman also testified to alleged inconsistencies between the preliminary police report and the chemistry lab report, the former of which referred to a seizure of 174 plants and the latter of which referred to a seizure of 221 plants/cuttings [5]. In addition, the police report noted plants as large as three feet tall, while the chemistry lab photographs, according to Gettman, appeared to show plants no more than twenty inches tall. Gettman testified that he was unable to determine the aggregate weight of the marijuana seized based only on the reports and the photographs. (*Id.*

---

**5.** Varughese testified that he personally observed root systems on the cuttings or clones, thereby classifying them as plants, although he conceded that the photographs did not show the roots. (N.T., 2/26/04, at 45). Varughese was of the opinion that 221 plants had been seized. (*Id.* at 46).

at 29). The trial court concluded that all of these problems "severely hinder[ed] [Appellee's] ability to confront the evidence presented against him" and constituted a denial of due process. (Trial Court Opinion at 5).

¶ 18 Applying the *Trombetta* standard to the facts of this case, we are compelled to disagree with the trial court on every factor relevant to a finding of due process. It is important to reiterate that the Commonwealth was required to prove that Appellee possessed a minimum of 51 live marijuana plants or over 50 pounds of marijuana, in order to render Appellee subject to a five-year mandatory sentence. 18 Pa.C.S.A. § 7508(a)(1)(iii). In order to have the charges dismissed, therefore, Appellee was required to establish that the destruction of evidence in this case hampered his ability to challenge the imposition of such a sentence. *Commonwealth v. Tillia*, 359 Pa.Super. 302, 518 A.2d 1246, 1252 (1986) (due process requires disclosure of favorable evidence that is material to defendant's guilt or punishment). We address first the question of whether the evidence that was destroyed had exculpatory value that was apparent prior to its destruction.

¶ 19 The allegation that the evidence at issue was exculpatory cannot be based on a mere assertion. *Commonwealth v. Small*, 559 Pa. 423, 441–42, 741 A.2d 666, 676 (1999). Here, Appellee offered even less than an assertion—he offered only speculation at the pretrial hearing on the motion to dismiss. Gettman testified that he "would have liked to have examined" the plants and then compared the actual physical evidence to the information about them contained in the reports. (N.T., 11/13/03, at 26). **He did not assert** that he believed the items reflected in the photographs were not marijuana plants or parts thereof. He merely testi-

fied that he was unable to see all parts of all items in the photographs and, further, he questioned whether the heights reflected in one of the reports were accurate given the appearance of some of the items in the photographs. While all of this information certainly was relevant to Appellee's case, it falls far short of being exculpatory. Upon review of the entire record, we determine that Appellee has failed to establish that the destroyed evidence had apparent exculpatory value.

¶ 20 Even if we were to assume, *arguendo*, that the entirety of the plant evidence may have had some exculpatory value, we would conclude nonetheless that the destruction of the evidence did not deprive Appellee of the opportunity to obtain comparable evidence by other reasonably available means. *Trombetta, supra* at 489, 104 S.Ct. 2528. Indeed, in this case the Commonwealth *insured* the existence of comparable evidence prior to destroying the primary evidence, and provided that comparable evidence directly to Appellee. Chemist Varughese took photographs of every piece of evidence seized. Those photographs were so extensive and so detailed that Appellee's expert was able to reach conclusions about the nature of the plants (such as which were live plants, which were dried plants, which were cuttings, which were stalks, and which did not fit into any of those categories), raise questions concerning certain attributes of the plants (such as their height), note alleged inconsistencies between the physical evidence and the official reports (such as the different numbers of plants claimed to have been seized), and point out inadequacies in the photographs (such as when it was impossible to tell whether the cuttings had root systems).

¶ 21 Indeed, Gettman's thorough analysis of the reports and the photographs, as well as his cogent opinion testimony re-

garding precisely what the photographs showed and what they did not show, was by far the best proof that Appellee indeed had access to comparable evidence. The evidence allowed Appellee to challenge the Commonwealth's claim that if convicted, Appellee was subject to at least a five-year prison term, the highest mandatory sentence under the law. Ironically, it was precisely this comparable evidence that prompted Gettman to testify that the documentary and photographic evidence, *without doubt*, showed Appellee possessed over 51 live plants:

Q [By Appellee's Counsel]: So, as a result of your examination, sir, am I correct that you feel, to a reasonable degree of scientific certainty, that the Commonwealth can establish that this were [sic] 97 live plants?

A: Yes, sir.

\* \* \*

Q [By the Prosecutor]: You said the pictures are persuasive; what does that mean?

A: With respect to the 97 fresh plants, at least fresh when they were seized, the photographs show that the plants had lots of vegetative growth on them, [and] that they have a root system.

Q: Okay, so they were persuasive that they were live plants, 97 of them?

A: Yes.

(N.T., 11/13/03, at 27–28; 33–34).

¶ 22 The record evidence itself establishes that, as in *Trombetta*, the various challenges Appellee wished to raise regarding the destroyed evidence could be raised despite its destruction. Thus, based on the extensive photographs and reports, Appellee was able to mount a defense by disputing the total number of plants, the chemist's inclusion of cuttings as plants, and by challenging the absence of proof that root systems existed on some items alleged to be plants. Clearly, Appellee was "perfectly capable of raising these issues without resort to [all of the marijuana seized]." *Trombetta, supra* at 490, 104 S.Ct. 2528. Appellee also had the opportunity to have his own expert test each of the samples that had been retained, although he apparently chose not to do so. In sum, the evidence provided Appellee with ample opportunity to challenge the imposition of sentence sought by the Commonwealth.[6]

¶ 23 With regard to the requirement of bad faith on the part of police in destroying the evidence, we observe that the record shows only good faith conduct in this case. First, the destruction was performed pursuant to department policy. There is simply no evidence of record, and Appellee even now does not allege, that the destruction was accomplished in a "calculated effort to circumvent the disclosure requirements." *Trombetta, supra* at 488,

6. In his brief, Appellee complains that the discrepancies between the reports and the photographs, coupled with the absence of the evidence itself, leaves questions as to whether the marijuana depicted in the photographs was actually the evidence seized from Appellee in this case. (Appellee's Brief at 21). Gettman testified that he could not determine, within a reasonable degree of scientific certainty, whether the evidence depicted in the photographs was the evidence which had been seized from Appellee. (N.T., 11/13/03, at 28). Of course, even if Gettman had been able to physically examine the evidence that had been photographed, he would still have had no way of knowing whether it had been actually seized from Appellee. The chain of custody of the evidence is a separate matter completely, and one not challenged by Appellee below. In any event, issues regarding chain of custody concern the "weight that is to be afforded evidence" and so would not be a proper consideration in a motion to dismiss based on due process. *Commonwealth v. Copenhefer*, 553 Pa. 285, 312, 719 A.2d 242, 256 (1998).

104 S.Ct. 2528. Although the evidence was destroyed the day after the trial court signed an order allowing for examination by Appellee's expert, the destruction was accomplished pursuant to an order signed one month earlier that mistakenly had listed Appellee's case among other, closed matters.

¶ 24 Further, the policy at issue here is a reasonable one, based as it is on health, environmental, and space concerns in connection with the storage of live marijuana plants. In addition to the health and storage issues that would accompany the maintenance of such evidence, we note the great burden in terms of work hours necessary to retain—and maintain—live marijuana plants. It would be absurd to expect police department personnel to tend to every criminal defendant's entire marijuana crop, including watering the plants and assuring they get proper lighting, until such time as the defendant decides to request examination of the evidence. In the matter *sub judice*, Appellee did not make his request until more than six months after his arrest.

¶ 25 The department's alternative to maintaining and storing the plants is an eminently reasonable one. The plants are "counted, weighed, photographed[,] and analyzed so that the exact number and weight of live plants necessary for mandatory minimum purposes is preserved as evidence." (N.T., 9/16/03, at 19–20). Further, a detailed report is generated by the examining chemist and samples from the plants are "preserved for re[-]analysis and presentation in court." (*Id.*). We conclude with certainty that the policy drafted by the department amply protects a criminal defendant's due process rights, and the evidence of record in this case only reinforces that conclusion. The department's conduct in no manner constitutes bad faith.

¶ 26 Before concluding, we note that Appellee presents his counter-argument in the context of *Brady*, that is, as a claim that the Commonwealth failed to turn over exculpatory evidence to the defense. But matters such as this one are not to be analyzed under *Brady*, as made clear by the United States Supreme Court:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material[,] exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Youngblood, supra* at 57, 109 S.Ct. 333.

¶ 27 Like the Court in *Youngblood*, we are confident that *Brady* does not present the proper analysis in this case. Instead, *Trombetta* and its progeny in the federal courts and in this Commonwealth apply. *See Youngblood, supra; Gamber, supra; Tillia, supra*. This is not a case wherein the Commonwealth failed to disclose material, exculpatory evidence. Rather, it is a case wherein the Commonwealth, for a variety of sound reasons, could not preserve all of the inculpatory evidence in its original state and so implemented a reasonable, efficient, and appropriate alternative to preservation.

¶ 28 We likewise reject Appellee's claim that *Commonwealth v. Deans*, 530 Pa. 514, 610 A.2d 32 (1992), establishes a due process violation here. In *Deans*, the appellant had been charged with forgery for attempting to collect a prize with a bogus lottery ticket. Prior to the appellant's arrest, the Commonwealth lost the ticket. Nonetheless, the Commonwealth moved

forward with the prosecution, and at trial sought to offer expert testimony from the state police document examiner who had investigated the matter and prepared a written report. The *Deans* court determined that even in the absence of bad faith on the part of the Commonwealth, the appellant's due process rights would be violated if the prosecution were permitted to go forward. The Court reached its conclusion based on a number of factors, including that the Commonwealth lost the evidence before it even had made an arrest. *Id.* at 519, 610 A.2d at 35. Further, and perhaps most importantly, the *Deans* court recognized that its facts were unlike the majority of criminal matters wherein the prosecution's case is based on physical evidence:

> Our holding that expert testimony in this case would violate appellant's due process rights is, of course, based on the specific facts in this record. Loss of evidence need not preclude expert reports or testimony in every case. Results of tests conducted on different types of evidence will produce differing degrees of probability, sometimes amounting almost to a certainty. Chemical analyses of blood, breath, and narcotic substances produce consistent, highly reliable results.

*Id.* at 520–21, 610 A.2d at 35.

¶ 29 *Deans* has no application in this case because the loss of evidence in *Deans* resulted in the appellant's complete inability to mount a defense. As our discussion above demonstrates, Appellee here had ample opportunity to examine the evidence against him by way of samples, photographs, and reports. The reliability and efficacy of this method was attested to eloquently, albeit unwittingly, by Appellee's own expert, who was able to assess the accuracy of the evidence and raise challenges to some of the Commonwealth's assertions. This same defense expert testimony established that police had seized

at least 97 live marijuana plants, a number well in excess of that required by statute for the imposition of the mandatory sentence sought here by the Commonwealth. The destruction of those plants, along with the other items seized by police, did not violate Appellee's due process rights. *Trombetta, supra.*

¶ 30 Based on all of the above, we conclude that the trial court abused its discretion when it found that the Commonwealth's destruction of some of the evidence in this case constituted a violation of Appellee's due process rights. The Philadelphia Police Department's policy with respect to maintenance and storage of live marijuana plants is a logical one that amply protects a criminal defendant's due process rights. Further, the conduct of the department in this case, pursuant to the policy, was accomplished in a reasonable and good faith manner. Thus, we conclude that the trial court erred in dismissing the PWID charge, and accordingly, we reverse the trial court's order and remand the matter for further proceedings.

¶ 31 Order reversed; matter remanded; jurisdiction relinquished.