J-S02017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARTHUR BURTON SCHIRMER | : | |
| | : | No. 2382 EDA 2017 |
| Appellant | | |

Appeal from the PCRA Order June 26, 2017
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0002107-2010

BEFORE: BOWES, J., NICHOLS, J., and RANSOM, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 15, 2018**

Appellant Arthur Burton Schirmer appeals from the order denying his timely first petition filed pursuant to the Post Conviction Relief Act (PCRA).[1] Appellant claims that (1) his defense and appellate counsel provided ineffective assistance of counsel, (2) the Commonwealth violated **Brady v. Maryland**[2] by failing to disclose data used to generate blood spatter photographs, and (3) the trial court lacked subject matter jurisdiction. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

This matter involves the death of Appellant's second wife, Betty Jean Schirmer, who initially was thought to have died from a massive head injury suffered in a motor vehicle accident on July 15, 2008. As the PCRA court summarized the facts:

> Joseph Musante was the husband of [Appellant's] assistant, Cynthia Musante. [In October of 2008], Joseph Musante broke into [Appellant's] office at the United Methodist Church in Reeders, Pennsylvania[,] and committed suicide while seated at [Appellant's] desk. Joseph Musante believed that [Appellant] and Cynthia Musante were engaged in an extramarital affair. The suicide and allegations of the affair[3] caused members of the Pocono Township Police Department to inquire further into [Appellant's] background and the circumstances of the deaths of both of his wives.[4] The investigation into the [July 2008] motor vehicle accident which allegedly caused the death of Betty Schirmer was reopened.
>
> On December 16, 2008, members of the Pocono Township Police Department and the Pennsylvania State Police executed a number of search warrants on the church and parsonage of the United Methodist Church in Reeders, Pennsylvania. On that same date, [Appellant] voluntarily drove to the Pennsylvania State Police Barracks at Fern Ridge and met with members of the investigating team.
>
> On January 6, 2009[,] investigators executed a search warrant on [Appellant's] person to collect a sample of his blood.
>
> The reopened investigation into the accident revealed a number of reasons to question the initial determination that the cause of death was accidental. There was a large quantity of blood inside the vehicle, a PT Cruiser. This blood was largely contained to the

___

[3] Joseph Musante's sister, Rosemarie Cobb, wrote a letter to the United Methodist Church after Musante's death, requesting an investigation of Appellant based on the suicide and alleged affair. **See** N.T., 1/8/13, at 29-31.

[4] Appellant pled guilty to third-degree murder concerning the death of his first wife, Jewel Schirmer, after the trial in the instant matter.

front passenger side of the vehicle. There was minimal damage to the body of the car, especially considering the speed [Appellant] claimed to be traveling. There was testimony that the car was in fact drivable. Air bags did not deploy. [Appellant] was uninjured.

Retired State Trooper Philip Barletto testified as an expert in crime scene reconstruction, crime scene processing, and blood spatter analysis. He opined that after reviewing photographs of the inside of the vehicle, he believed that the victim was bleeding prior to entering the vehicle. Analysis of the blood spatter inside the vehicle revealed that the points of impact inside the car were with an object that was already bloody. This was different from an uninjured person striking an object inside the vehicle, being cut and then beginning to bleed. A drop of blood inside the door caused investigators to believe that the door had been closed over the blood. The victim's blood was on the seat underneath [Appellant], though he never left the vehicle as the victim was being removed. The victim was also sitting in her own blood where it would be expected that a void in the shape of her body would exist on the seat if the victim were injured while sitting in the vehicle.

Luminol processing[5] inside the garage revealed what appeared to be a trail of blood from the back door of the garage to the passenger side of the vehicle. When confronted by [Sergeant Mark Holtsmaster] with this information[, Appellant] told [him] that his wife had bled on the garage floor when a stack of wood, about 17 inches high, fell over and cut the victim's arm.[6]

The initial speed reported by [Appellant]—approximately 45 miles per hour—was questioned by police. The minimal damage to the vehicle and the non-deployment of air bags caused the estimated speed to ultimately be set at between 15 and 25 miles per hour. Although good photos were not taken of the roadway, there did not appear to be skid marks or anything consistent with [Appellant's] story of swerving to avoid hitting a deer.

---

[5] Luminol processing is the technique used to detect and visualize the presence of blood where it is not visible to the naked eye. *See* N.T., 1/9/13, at 95-96.

[6] Appellant eventually admitted to Sergeant Holtsmaster that he lied about the stack of wood falling and cutting the victim's arm. *See* N.T., 1/16/13, at 18.

There was also testimony regarding [Appellant's] cold demeanor, noted by a passerby who reported the accident, family members at the hospital and by first responders. There was testimony regarding the state of [Appellant's] marriage. There was also testimony about the circumstances surrounding the death of [Appellant's] first wife[, admitted for limited purposes pursuant to Pa.R.E. 404(b). Appellant elected to testify at trial.].

* * *

On January 23, 2013, a jury found [Appellant] guilty of [m]urder in the [f]irst [d]egree and [t]ampering with [e]vidence.[7] [Appellant] was sentenced on March 18, 2013 to life in prison without the possibility of parole. [The trial court] also sentenced [Appellant] to three (3) to twenty-four (24) months in prison for the [t]ampering with [e]vidence conviction.

PCRA Ct. Op., 6/26/17, at 2-5 (citations and footnotes omitted).

The trial court denied Appellant's timely-filed post-sentence motions seeking judgment of acquittal, or, alternatively, a new trial. Thereafter, Appellant filed a direct appeal. This Court affirmed Appellant's judgment of sentence on December 23, 2014. *See Commonwealth v. Schirmer*, 2644 EDA 2013 (Pa. Super. filed Dec. 23, 2014) (unpublished mem.). The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on September 30, 2015. *See Commonwealth v. Schirmer*, 125 A.3d 1201 (Pa. 2015).

Appellant filed the instant first PCRA petition *pro se*, which was docketed on September 26, 2016. The Monroe County Public Defender's office was appointed to represent Appellant. PCRA counsel did not file an amended

_____

[7] 18 Pa.C.S. §§ 2501(a) and 4910(1), respectively.

- 4 -

petition. Following a hearing on the PCRA petition on March 6, 2017, and the filing of related briefs, the PCRA court denied Appellant's PCRA petition on June 26, 2017.

Appellant filed a timely notice of appeal and court-ordered concise statement of errors complained of on appeal under Pa.R.A.P. 1925(b). The PCRA court referred to its opinion filed when denying the PCRA petition in lieu of preparing a new responsive opinion.

Appellant raises the following questions for our review:

1. Was [defense] counsel ineffective for failing to object to prosecutorial misconduct, overreaching and bad faith?

2. Did the conduct of the [Commonwealth], shown through opening and closing statements, presentation and characterization of the evidence deny [Appellant] a fair trial?

3. Was appellate counsel ineffective for failing to reproduce a complete record on appeal, including the photographs and letter written by a relative of the suicide victim, thus preventing effective appellate review of [Appellant's] claim of undue prejudice from such evidence?

4. Did the cumulative effect of counsel's errors deny [Appellant] effective representation of counsel?

5. Did the Commonwealth violate **Brady v. Maryland** by failing to provide the underlying data used to compile blood spatter photos introduced by the Commonwealth's expert at trial, thus denying effective cross-examination and proper rebuttal?

6. In the event a new trial is awarded, would not the trial [be] barred on the grounds of double jeopardy?

7. Did the court lack subject matter jurisdiction due to material defects in the charging statutes and information as filed?[8]

Appellant's Brief at 4 (full capitalization omitted).

In his first two issues, Appellant raises the ineffectiveness of defense and appellate counsel. Appellant asserts that defense counsel should have objected to the following: (1) comments the prosecutor made during opening statements and closing argument, (2) the Commonwealth's cross-examination of Appellant about masturbation, and (3) the direct examination of Sergeant Mark Holtsmaster that allegedly allowed him to testify to an opinion regarding Appellant's truthfulness.[9] Appellant also asserts that appellate counsel was ineffective for failing to include certain documents in the certified record on appeal.

The applicable standards of review regarding the dismissal of a PCRA petition and ineffectiveness claims are as follows:

> We must examine whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.
>
> * * *
>
> It is well-established that counsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's

---

[8] We note that Appellant discusses the first four questions presented as one issue, in contravention of Pa.R.A.P. 2119(a). Additionally, we have reordered the questions presented for ease of disposition.

[9] We have reordered the discussion of these issues for ease of disposition.

interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error.

***Commonwealth v. Franklin***, 990 A.2d 795, 797 (Pa. Super. 2010) (citations omitted). Additionally, "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." ***Commonwealth v. Reid***, 99 A.3d 470, 520 (Pa. 2014) (citation omitted).

Appellant first argues that defense counsel should have objected to remarks made by the Commonwealth during opening statements and closing argument. During opening statements, the Commonwealth indicated that "there's going to be a lot more detail, and I know this isn't going to be a pleasant thing for you all to sit and listen to," and then described the case as "a journey into the darkest inner recesses of the human soul." N.T., 1/8/13, at 61. Appellant argues that defense counsel should have objected to these statements because the Commonwealth attempted "to paint [Appellant] in the darkest persona as possible" and incite the jurors based on their religious beliefs, and that "[his] soul was not on trial." Appellant's Brief at 14. During closing arguments, the Commonwealth referred to Appellant as the "sinister minister" several times. ***Id.*** at 19; ***see*** N.T., 1/22/13, at 76, 95, 110. Appellant argues that the "sinister minister" phrase exceeded the proper boundaries of closing statements. Appellant's Brief at 19.

When considering claims that a prosecutor has committed misconduct in his or her comments to the jury, we note the following:

> It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to

- 7 -

the extent that a mistrial is warranted. Comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Bronshtein*, 691 A.2d 907, 917 (Pa. 1997) (citations omitted).

An opening statement must contain "fair deductions from the evidence which the prosecutor expects will be presented at trial." *Id.* at 918 (citations omitted). As to closing arguments, they

must be considered in the context of the entire . . . summation and allegations of prosecutorial misconduct will not warrant the grant of a new trial unless they are such as to arouse the jury's emotions to such an extent that it is impossible for the jury to reach a verdict based on relevant evidence.

*Id.* (citation omitted). Prosecutors may employ reasonable "oratorical flair" in their statements to the jury. *Id.* Additionally, where the trial court clearly instructs the jury that the prosecutor's comments are not evidence, the jury is presumed to follow the instruction. *Id.*

Here, the phrase the Commonwealth used regarding the "inner recesses of the human soul" must be taken in context with the Commonwealth's phrases immediately beforehand describing the case as a whole. The Commonwealth was not referring to Appellant or Appellant's soul in particular, but rather the fact that the case involved a murder and a suicide, which would later be substantiated by the evidence adduced during the trial. Additionally, the comment did not serve to inflame the jury or divert the jurors' attention

from the issues at hand. Accordingly, we discern no error on the part of counsel in not objecting to this comment. *Id.*

As to the use of the phrase "sinister minister" during closing arguments, we agree with the PCRA court that the phrase was permissible oratorical flair. *Id.* Nor can it be said that these remarks prejudiced Appellant such that the jury was unable to render an impartial verdict. *See id.* Moreover, the court instructed the jury that the arguments of counsel are not evidence, and the jury is presumed to have followed that instruction. *See id.* Accordingly, no relief is due on the basis of defense counsel failing to object to the use of the "sinister minister" phrase.

In his next claim of defense counsel's ineffectiveness, Appellant asserts that counsel should have objected to the Commonwealth's cross-examination of Appellant regarding masturbation. Appellant claims that the Commonwealth's "delving into [Appellant] gratifying himself, even to the point of asking which hand he masturbates with, not only was irrelevant, but had been consciously chosen by the [Commonwealth] to be embarrassing and prejudicial to the defendant." Appellant's Brief at 15-16.

Appellant's claim focuses on the following exchange:

[Commonwealth]: . . . And you told Cindy [Musante] that you weren't getting any sex from [your wife]?

[Appellant]: I did tell Cindy that.

Q: And you were taking care of yourself?

A: Yes, sir.

Q: Your right hand?

A:  Yes, sir.

N.T., 1/18/13, at 116.

As the PCRA court noted, when viewed in the

context of the entire case[, including closing argument,] it is clear that defense counsel was not ineffective for failing to object.  The Commonwealth's entire case was built around the motive of a deteriorating and sexless relationship driving [Appellant] to infidelity and eventually murder[:]

> And one of the exhibits you'll see is his appointment book for that year, and you'll see that Anne Marie T. Moe, however it's written in there, comes up quite frequently with appointments, and many of those appointments are later in the evening, 7:30, 8:30, that sort of thing.  So what she's telling you is consistent with what the other women have seen and did. It's consistent with what the emails reflect, this [Appellant's] state of mind, the hypocrisy, the pretense that he admitted to, that sort of thing. But as far as the motive goes, that's only the tip of the iceberg.

N.T., 1/22/13, at 110.

* * *

As [Appellant's] relationships and lack of intimacy was a corner stone of the Commonwealth[']s case, its questioning was not improper and thus [d]efense counsel cannot be found ineffective for failing to object.  In fact, the Commonwealth needed evidence of [Appellant's] preferred hand for their summation:

> Bear in mind also that the [Appellant] is right-handed. Remember he admitted that.

> So after he gets [his wife] in the car, she's out.  He reaches in with his left hand, and he moves the mirror out of the way leaving those bloody marks consistent with finger marks there.  And then with his right hand with the murder weapon, with that metal object, he strikes and makes that little crack because there's blood there[.]

N.T., 1/22/13, at 130.

PCRA Ct. Op., 6/26/17, at 16-17.

Following our review, we agree with the PCRA court that defense counsel was not ineffective for not objecting to the line of questioning regarding masturbation. **See Franklin**, 990 A.2d at 797. As the PCRA court noted, the lack of intimacy between Appellant and his second wife was relevant to show Appellant's motive for the killing. Similarly, the question regarding Appellant's favored hand bore at least some relevant purpose under the circumstances of this case. Therefore, we discern no abuse of discretion in the PCRA court's determination that Appellant was not entitled to relief on this claim.

Next, Appellant argues that defense counsel should have objected to the questioning of Sergeant Mark Holtsmaster. Appellant asserts that "[d]espite being instructed by the trial judge to not ask questions in a manner that will elicit opinions about [Appellant's] truthfulness[,] the Commonwealth continued to ask questions eliciting Sergeant Holtsmaster's opinion about [Appellant's] truthfulness." Appellant's Brief at 18. In particular, Appellant asserts that Sergeant Holtsmaster's characterization of Appellant's statements to him during the investigation as a "supposed" story "went unchallenged by his counsel, who should have made continuous objections to this manner of leading the witness." **Id.** at 16. In sum, Appellant asserts that the Commonwealth's and Sergeant Holtsmaster's repeated use of the term "supposed" interjected the sergeant's personal opinion on Appellant's credibility. **Id.**

Appellant's claim involves the following exchanges during the direct examination of Sergeant Holtsmaster:

[Commonwealth]: And did you get the basic demographic, biographical information from [Appellant]?

[Sergeant Holtsmaster]: That's correct. Once I gather that information, then I'll start talking about the information that I want to talk about. We started first with his relationship with the victim in this case. I asked him how his relationship was. He stated that she was his best friend. I asked him to rate the relationship.

Q: I'm sorry. What did you say, to what the relationship?

A: To rate it.

Q: Rate it?

A: Rate the relationship on a scale of 1 to 10, and he rated the relationship at a 10. To me, this first red flag that I saw during this interview was -- I find that people if they're being truthful will convey information. They'll tell the details. They'll give you the details --

[Defense Counsel]: Your Honor, may we approach?

THE COURT: Yes.

(The following discussion was held on the record at sidebar.)

[Defense Counsel]: Your Honor, frankly, I believe it's improper for him to be at this point referring to, I guess, an opinion on somebody else's truthfulness, the [Appellant's] truthfulness, while offering an opinion as to that at the trial. That's what he's doing. That's where he's headed. I thought he would have been instructed otherwise not to do so.

[Commonwealth]: . . . [T]he witness made no reference to whether his personal opinion of truthfulness was conveyed at all to the jury. In other words, I don't think he was telling the truth. He's conveying the methodology of why he starts questioning along those lines, those types of questions. And if he in his mind during the interview has a red flag, then the course of his

questioning will be adjusted accordingly. He's just explaining that process.

THE COURT: I think the objection raised was to: I find that when people do this they're not telling the truth.

[Defense Counsel]: He can't say that. I ask that they be instructed to ignore that.

THE COURT: Well, I'm just going to tell you to ask him questions that are not going to elicit an opinion on the [Appellant's] truthfulness.

[Commonwealth]: Okay.

(The discussion at sidebar concluded.)

BY [Commonwealth]:

Q: Sergeant, when I question you, I don't want you to give us your opinion as to whether or not the [Appellant] was truthful or not, okay, just the actual substance of the interview.

* * *

Q: After this supposed fall of the wood pile, you said the [Appellant] claimed the victim was injured on her what forearm, right or left?

A: On her left forearm, and this supposedly occurred -- I questioned him further on that because this injury was supposed to occur in the summer. I asked him, "Was it visible? Did she wear short sleeve shirts? Was it covered by a bandage? Did she require any type of medical treatment? Did she have to go to the hospital?" He stated that she did not have to go to the hospital but it was bandaged and it was visible.

* * *

Q: What happened next?

A: Next I confronted him about his story, that I did not believe it. It didn't make sense to me. How could a wood pile 3 high, 10 across cause this injury? It just wasn't possible. It just wasn't physically possible. I told him it didn't make sense, and the [Appellant] agreed with me that it didn't make sense to him either.

Q: What happened next, sir?

A: After that -- basically, how it started into that, the [Appellant], number one, he admitted that he lied about the injury. Go ahead. I'm sorry.

N.T., 1/16/13, at 8-10, 16-18.

Our review of the above-quoted exchanges reveals that Sergeant Holtsmaster characterized his interview with Appellant in the context of explaining his questioning process and ultimately to explain that this process led to Appellant admitting he had lied about his wife being injured by the woodpile. As the PCRA court noted, that portion of testimony "was a factual recitation of the interaction between the two." PCRA Ct. Op., 6/26/17, at 14. Accordingly, this issue lacks merit and we discern no error on the part of counsel in failing to object to the use of the word "supposed." *Franklin*, 990 A.2d at 797.

Appellant also asserts that appellate counsel was ineffective for failing to ensure that certain items were part of the certified record on appeal. Appellant's Brief at 7, 20. Specifically, Appellant claims that appellate counsel failed "to complete the record to include highly prejudicial documentary evidence in the form of pictures and a letter written by the sister of [the] suicide victim." *Id.* at 7.

We note that this argument is not properly developed, as Appellant does not indicate precisely how he was prejudiced or how the outcome of his appeal would have been different. Indeed, Appellant's entire argument is that

> appellate counsel was clearly ineffective for failing to include crucial parts of the record to allow [this] Court to make a proper determination and evaluation of the prejudicial effect of the evidence introduced. At a minimum, [Appellant's] direct appeal

- 14 -

rights should be re-instated with a completed record submitted. As counsel was ineffective both at trial and on appeal[,] the overall cumulative result of counsel's performance denied [Appellant] effective assistance of counsel and thus denied him due process.

*Id.* at 20.

Appellant has not referred to or specified the particular photos or contents of the letter which he believes were required to complete a full review in his direct appeal. Thus, the general, conclusory assertion that the failure to include these documents in the certified record does not warrant relief, as Appellant has not established that the outcome of his direct appeal would have been different.[10]  *See Franklin*, 990 A.2d at 797.

_____

[10] In any event, we note that Appellant raised two separate issues regarding evidence of Musante's suicide in his direct appeal. *See Schirmer*, 2644 EDA 2013, at *6-8. First, Appellant claimed that the admission of any evidence of Joseph Musante's suicide was unduly prejudicial. *Id.* at *6. Second, assuming that evidence of the suicide was admissible, Appellant appeared to suggest that the inclusion of the letter and photographs would have warranted a new trial because they were cumulative and particularly prejudicial. *Id.* at *8 n.5.

This Court, in Appellant's direct appeal, affirmed the trial court's decision to allow the Commonwealth to admit evidence of Musante's suicide. *Id*. at *8. As stated above, Appellant has failed to provide any argument that the inclusion of the letter and photographs would have changed our decision with respect to the admission of evidence of Musante's suicide generally.

With respect to the admission of the letter and admission of the photographs taken at the scene of Musante's suicide, this Court found Appellant's claim waived based on appellate counsel's failure to include the letter and photographs in the certified record. *Id.* at *8 n.5. Our review, however, reveals that defense counsel did not object to this evidence at the first opportunity to do so at trial. *See* N.T., 1/8/13, at 29-31; N.T., 1/11/13, at 48. Thus, Appellant's claims regarding the prejudicial effect of the materials specifically were waived for the purpose of direct appeal regardless of their inclusion in the certified record.

Appellant next claims that the cumulative effect of the ineffectiveness of defense and appellate counsel denied him due process. Appellant's Brief at 20. However, since none of his claims of ineffectiveness have merit, Appellant is due no relief on a cumulative ineffectiveness claim. *See Reid*, 99 A.3d at 520.

Appellant next asserts that the overall conduct of the Commonwealth warrants a new trial. However, next to no argument is devoted to this issue. Rather, Appellant simply states that "[n]otwithstanding the ineffective performance of [defense] counsel, the conduct of the [Commonwealth] alone[ indicates that Appellant] should be awarded a new trial, free of the unfair bias, irrelevant and prejudicial conduct inflicted upon [him] personally." Appellant's Brief at 20. Accordingly, since this issue involves only a conclusory statement and no citation to pertinent authority, we find it to be waived. *See* Pa.R.A.P. 2119(a).

Even assuming Appellant is referring to the remarks the Commonwealth made during opening and closing statements and various lines of questioning that Appellant has argued were objectionable, we have already found that the prosecutor did not engage in misconduct and that defense counsel was not ineffective for failing to object to these portions of the proceedings. Thus, Appellant is due no relief on this issue.

In his next issue, Appellant asserts that the Commonwealth committed a *Brady* violation by failing to exchange data utilized by the Commonwealth's blood splatter expert. In particular, Appellant claims that the Commonwealth

- 16 -

withheld files related to luminol processing that were created during the generation of a Commonwealth exhibit. Appellant alleges that such files are partially processed "component parts" of layered images.[11] Appellant's Brief at 24. Appellant asserts that he is "entitled to have an independent expert review the [partially processed Photoshop] files utilized by the Commonwealth's expert, and not be compelled to accept their conclusions." *Id.* at 22 (citing *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017)).

By way of background to this claim, the following exchange occurred during trial at sidebar:

> [Defense Counsel]: Your Honor, the only objection I have would be to the exhibit identified as 16C.
>
> THE COURT: Can I see that? Thank you.
>
> [Defense Counsel]: On 16C, there are photos, JRC 5314(3) copy, JRC 5320(8)A, JRC 5378A copy, JRC 5378AB, and JRC 5370A. These are photos that actually have been overlaid on top of each other. They have been Photoshopped. I've asked for originals of the processing. I know the Commonwealth claimed that they're saying they are work product and I wouldn't be entitled to them, but they just haven't been disclosed.
>
> [Commonwealth]: That's hogwash, Judge. Also, I'll tell you why. I've got an email after *voir dire*, after jury selection, where Defense counsel asked for raw data of some kind of format that I never heard that before.
>
> [Defense Counsel]: I asked for PSD files. I was –
>
> THE COURT: Hang on for a second. Let's take one at a time. Tell me your position.

---

[11] Such data is allegedly in the form of Photoshop files. Photoshop is a photo editing software. *See* N.T., 1/9/13, at 99.

[Commonwealth]: So I got this email requesting things I never heard of before, raw data, of that nature, and it was asked for with respect to luminol photographs. The Defense had been given the photos that are in front of you, Your Honor, and more depicting various luminol enhancements for over a year, if not, closer to two, as part of discovery. The request made at this hour was something I couldn't even comply with, finding raw data for that. I bounced it off the troopers. And as I understand it, you put the camera on a tripod. You take a picture in the light of the area. You apply luminol and lower the light so that it's dark. And if it luminesces, you take a picture in the dark. And those pictures are taken from identical locations because they were on a stationary tripod, and the photos were overlaid, and this trooper will testify to his expertise and enhancement procedures.

THE COURT: So could you tell me that then -- in other words, say this photo then was taken in the light without the luminol and then the photo that's objected to is taken.

[Defense Counsel]: It's not a photo.

[Commonwealth]: Yes, it's a photo with the luminol in the dark.

[Defense Counsel]: No, it is not.

THE COURT: Wait.

[Commonwealth]: The dark photograph is overlaid with the light one so you can get a sense of exactly where in the room it is, and that's a procedure that's commonly employed by experts in the field of luminol technique, and the trooper will testify to all of that as part of my direct. And if there are issues with that, they would be maybe fodder for cross-examination but not the admissibility of the exhibit.

THE COURT: As I understand, the objection is that there's some kind of other photographs or --

[Defense Counsel]: These don't fully and accurately depict the luminol, Your Honor. There actually are no photos before Your Honor of the luminol. The luminol photos are in the dark. They luminesce, and then they lay one on top of this, and that is that photo. That's what he's testifying to in front of a jury. He should put in the luminol photo in the dark, whatever it looks like, and then show us how it's overlaid. If he's going to do it this way, he should show you the procedure.

- 18 -

THE COURT: My understanding is that there's going to be testimony to the process that you're trained on and where this happens.

[Commonwealth]: Yes, ma'am.

THE COURT: My understanding of your objection is there was something beyond what is shown here – he's not going to testify that this is a photo of the luminol. He's going to testify that it's an overlay.

[Commonwealth]: It's a composite of two photos and how he took them and the techniques employed and that those are techniques used customarily by witnesses in his field.

THE COURT: And are you saying that you have requested certain of these photos that were not provided to you?

[Defense Counsel]: I had received photos, and I believe at this point that I may have the underlying photo.

THE COURT: Okay.

[Defense Counsel]: It's a luminol photo. What I don't have are the Photoshop photos. There are PSD files that would have gone into the formation of the overlay that tell you how the overlay was made, whether any adjustments have been made to it. That's what I would be asking for in that request. To the extent, Your Honor, that these photos do not fairly and accurately depict what someone in that garage saw, I object. And I also object it may prejudice the jury to see evidence that never existed. That's my objection. I'll accept the ruling.

[Commonwealth]: Judge, if you recall your scheduling Order, quite sometime ago, motions *in limine*, 403 type of grounds, they are way overdue to begin with. I think counsel is just fishing for an issue that doesn't exist. All the issues he's raising so far he can raise during the cross-examination of this witness. That would be appropriate to the weight of the evidence.

THE COURT: Your objection is noted for the record.

[Defense Counsel]: Very good.

THE COURT: It was overruled, and the witness may use these photographs and proceed with the explanation of what they are, and you may cross-examine him on it.

- 19 -

[Defense Counsel]: Your Honor, I would also ask that this witness not be excused at the end and be subject to be recalled by the Defendant on Defendant's –

THE COURT: Well, let's see how direct and cross go on this, okay.

(The discussion at sidebar concluded.)

N.T., 1/9/13, at 71-76.

"To establish a **Brady** violation, appellant must demonstrate: the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued." **Commonwealth v. Walker**, 36 A.3d 1, 9 (Pa. 2011). "The allegation that the evidence at issue was exculpatory cannot be based on a mere assertion." **Commonwealth v. Free**, 902 A.2d 565, 571 (Pa. Super. 2006). Additionally, in the PCRA context, an appellant "must establish that the alleged **Brady** violation 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" **Commonwealth v. Haskins**, 60 A.3d 538, 547 (Pa. Super. 2012) (quoting 42 Pa.C.S. § 9543(a)(2)(i)). However, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b).

Preliminarily, we note that Appellant has been aware of the alleged **Brady** material, *i.e.* the Photoshop files, since the time of trial, at the latest. Accordingly, Appellant's **Brady** claim is waived because it could have been

J-S02017-18

raised in an earlier proceeding, including Appellant's direct appeal. ***See***

***Commonwealth v. Treiber***, 121 A.3d 435, 461 (Pa. 2015) (citations

omitted); ***see also*** 42 Pa.C.S. §§ 9544(b); 9545(b)(2).[12]

Even if we were to consider Appellant's ***Brady*** claim on the merits, it

would fail. Appellant has cited case law indicating the requirement that the

evidence at issue be exculpatory or be capable of being used for impeachment

purposes. However, at no point does he argue, let alone demonstrate, that

the partially processed photographs he seeks would fit either category.

Instead, Appellant baldly asserts that he has a right to have an expert review

the data at issue. This amounts to "even less than an assertion" that the

evidence at issue was exculpatory. ***Free***, 902 A.2d at 571. Additionally,

Appellant has neither argued nor established that the alleged ***Brady*** violation

has undermined the truth-determining process such that no reliable

_____

[12] As the PCRA court noted, Appellant's

> claim borders on being a previously litigated issue[. Appellant]
> has recategorized his argument as a ***Brady*** violation in order to
> get a second chance at litigating the claim. On direct appeal[,
> Appellant] raised the following issue for review: "Did the
> introduction of altered digital images of [luminol] glowing on a
> garage floor where the images never existed in real life and only
> tended to confuse and mislead the jury violate Pa.R.E. 403 and
> Pa.R.E. 901 in this close circumstantial evidence case." The
> Superior Court denied [Appellant's] claim[,] finding it lacked
> merit. In fact[,] it ruled that showing the unlayered photos and
> not the overlays would be potentially more confusing and
> misleading. Nevertheless, as [Appellant] is unable to establish
> any of the three prongs of the ***Brady*** test, his claim is **DENIED**.

PCRA Ct. Op., 6/26/17, at 24 (citations omitted).

- 21 -

adjudication of guilt or innocence could have taken place. *See Haskins*, 60 A.3d at 547.

Moreover, Appellant's reliance on *McWilliams* is inapposite and unavailing. *McWilliams* deals with the appointment of an expert witness in the context of an indigent defendant needing assistance "**to prepare an effective defense based on his mental condition**, when his sanity at the time of the offense is seriously in question." *See McWilliams*, 137 S. Ct. at 1793 (emphasis in original) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 70 (1985)). It simply has no bearing on the type of case instantly before us. Accordingly, Appellant is due no relief.

Next, Appellant asserts that the Commonwealth "engaged in deliberate prosecutorial misconduct[,] over-reaching in bad faith," which bars a new trial on the grounds of double jeopardy. Appellant's Brief at 26. Rather than state an argument for this issue, Appellant merely refers to his first and fifth argument sections:

> As described above at [Appellant's] first argument concerning trial counsel's ineffectiveness and ensuing prejudicing in failing to object or renew objections to the Commonwealth's continued prosecutorial misconduct throughout trial, the prosecution intentionally prejudiced [Appellant] to the jury to the point of denying him a fair trial. Moreover, the Commonwealth withheld and suppressed exculpatory evidence as set forth in the argument at Issue 5.

*Id.* at 27.

Instantly, we have already found that trial counsel was not ineffective for failing to object to these portions of the proceedings. By the same token,

the Commonwealth did not "over-reach" in its use of oratorical flair and its cross-examination tactics. Similarly, the Commonwealth did not commit a **Brady** violation. Because Appellant is due no relief on these discrete claims, we need not consider whether double jeopardy principles would have barred retrial.

Finally, Appellant argues that the trial court lacked subject matter jurisdiction over his case due to material defects in the charging statutes and information as filed. Appellant's Brief at 29. Appellant asserts that a conviction of first-degree murder requires proof of "malice," which does not appear in the record until after the defense rested, when the prosecution used the term in closing argument. **Id.** Appellant "submits he was never charged with malice nor notified to defend against it. Furthermore, the element of malice which is required to be proven beyond a reasonable doubt in order to convict a defendant of any degree of murder was never put to adversarial testing by trial counsel." **Id.** at 30 (citing **U.S. v. Cronic**, 466 U.S. 648 (1984)).

As the trial court aptly noted, Appellant's attempt to challenge an alleged defect in the information under the guise of subject matter jurisdiction warrants no relief.

> Subject matter jurisdiction relates to the competency of the court to hear and decide the type of controversy presented. **McGinley v. Scott**, 164 A.2d 424 (Pa. 1960). Jurisdiction is a matter of substantive law. **Id.** at 428; 42 Pa.C.S. § 931(a) (defining the unlimited original jurisdiction of the courts of common pleas). [Appellant] was charged with violations pursuant to the Crimes Code. Controversies arising out of violations of the Crimes Code

- 23 -

are entrusted to the original jurisdiction of the courts of common pleas for resolution. **See** 18 Pa.C.S. § 102. Every jurist within that tier of the unified judicial system is competent to hear and decide a matter arising out of the Crimes Code. Pa. Const. Art. 5 § 5 (establishing the jurisdiction of the courts of common pleas within the unified judicial system).

PCRA Ct. Op., 6/26/17, at 25. As such, Appellant's argument regarding lack of subject matter jurisdiction is without merit.[13]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/18

---

[13] Upon review, the charging documents appear to be without defect, as they adequately imply malice in relation to the murder charge against Appellant. **See Commonwealth v. Chamberlain**, 30 A.3d 381, 423 (Pa. 2011) (holding that a claim that a criminal information in a murder case was defective for failure to include the word "malice" was without merit where "the assertions contained [in the charging documents] adequately implied malice").